# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:_____**

**Filing Date: January 18, 2018**

**NO. S-1-SC-35104**

**STATE OF NEW MEXICO,**

Plaintiff-Appellant,

v.

**FILEMON V.,**

Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF GRANT COUNTY**
J.C. Robinson, District Judge

Hector H. Balderas, Attorney General
Kenneth H. Stalter, Assistant Attorney General
Santa Fe, NM

for Appellant


Bennett J. Baur, Chief Public Defender
Jeffrey J. Buckels, Assistant Public Defender
Santa Fe, NM

for Appellee

**OPINION**

**VIGIL, Justice.**

**I.  INTRODUCTION**

{1}  In this case we reexamine a juvenile's right to be free from self-incrimination, as secured by the Fifth Amendment of the United States Constitution and the Basic Rights provision under the Delinquency Act of the Children's Code, NMSA 1978, Section 32A-2-14 (2009). The State appeals the suppression of two statements made by sixteen-year-old Filemon V.

{2}  Filemon made the first statement to his probation officers. We hold that, absent a valid waiver, Section 32A-2-14(C) precludes the admission of Filemon's statement to his probation officers while in investigatory detention. We affirm the district court's order suppressing the use of the statement in a subsequent prosecution.

{3}  The second contested statement was elicited by police officers at the Silver City Police Department. Filemon was at this point in custody, and entitled to be warned of his *Miranda* rights. At issue is whether the midstream *Miranda* warnings were sufficient to inform Filemon of his rights. We conclude that the warnings were insufficient under *Missouri v. Seibert*, 542 U.S. 600, 617 (2004). Because the statement was elicited in clear violation of the Fifth Amendment and Section 32A-2-14, we affirm the district court's suppression of the statement.

## II. BACKGROUND AND PROCEDURAL HISTORY

{4} This case comes to this Court on interlocutory appeal from the Sixth Judicial District Court. Pursuant to Rule 12-201(A)(1)(a) NMRA, the State appeals the district court's order to suppress two statements, one elicited at the juvenile probation office and the other at the Silver City Police Department.

{5} Filemon was on probation for committing a delinquent act and expected to come to the probation office to pick up a travel permit. Filemon arrived at the probation office with his mother and stepfather. When he entered the lobby, Supervisor Rachel Medina greeted Filemon and asked if he was there to pick up the travel permit. Filemon responded that he "just shot Chugie and Eric."[1] Supervisor Medina asked what Filemon was talking about, and Filemon's mother interjected, stating that he was there "to turn himself in." At that point, Filemon's probation officer, Cody McNiel, entered the lobby. Filemon again said that he was there to "turn[] himself in," this time adding, "for murder, I guess."

---

[1] We do not assess the admissibility of the statements in the lobby. The district court found that these statements were spontaneous and unsolicited and Filemon does not contest that finding on appeal. *See State v. Javier M.*, 2001-NMSC-030, ¶ 40, 131 N.M. 1, 33 P.3d 1 (stating that volunteered statements are "not subject to the protections of Section 32A-2-14 since such statements are generally not in response to any 'questioning' or 'interrogation.' ").

{6}    Prior to Filemon's arrival, McNiel had been informed of a shooting and was helping to locate a potential suspect—Filemon's co-defendant in another case. Thus, McNiel knew what Filemon was talking about. McNiel told Filemon to "go ahead and come in and . . . we'll go to my office and . . . we'll discuss it."

{7}    McNiel escorted Filemon through a locked door and a hallway, to Supervisor Medina's office. McNiel shut the door. Filemon's parents told McNiel and Supervisor Medina that Filemon wanted to turn himself in to New Mexico State Police Officer Michael Dunn, because "that's who he trusts." McNiel stepped out and asked another probation officer to call the police, identifying Filemon as "the shooter."

{8}    Inside Supervisor Medina's office, McNiel asked if Filemon was there "to confess [to] the drive-by shooting." Filemon responded, "[I]t wasn't a drive-by." McNiel persisted, "[O]kay . . . why don't you go ahead and tell me the story then." Filemon responded with the first contested statement. McNiel continued to speak to Filemon until police arrived.

{9}    Supervisor Medina later testified that Filemon arrived at the probation office of his own volition, and neither she nor McNiel questioned Filemon. According to McNiel, however, McNiel "wanted to keep him talking until . . . law enforcement got there so that they could take him into custody." Filemon's mother "[did] most of the

3

talking" and "Filemon said very little." Neither probation officer advised Filemon of his *Miranda* rights or his right to remain silent under Section 32A-2-14. *See Javier M.*, 2001-NMSC-030, ¶ 41 (determining that Section 32A-2-14 requires a child to be warned of the right to remain silent during an investigatory detention).

{10} Several police officers arrived at the probation office, including Officer Dunn and Sergeant Joseph Arredondo. Sergeant Arredondo had been present at the hospital with the victims prior to his dispatch and knew Filemon was a suspect. Supervisor Medina told at least one police officer what Filemon had said. According to Supervisor Medina, the parking lot of the juvenile probation office looked "like Christmas" due to the number of police units and flashing lights.

{11} Sergeant Arredondo informed Filemon that "detectives needed to speak with him" and transported Filemon and his mother to the Silver City Police Department, where he turned Filemon over to Captain Javier Hernandez. Captain Hernandez met Filemon and his mother in the parking lot and asked if they would come inside. Captain Hernandez had been actively questioning an eyewitness to the shooting, and knew that the likely shooter was short, named "Fil," and had a "peanut-shaped" head, which matched Filemon's appearance.

{12} Seeing that the interview room was occupied with another suspect, Captain

4

Hernandez took Filemon and his mother to his office. Captain Hernandez summoned the case agent assigned to the murder investigation, Detective Pat Castillo. Captain Hernandez later testified that he intended for Detective Castillo "to sit there and listen to what [Filemon] had to say because the other witness . . . wasn't cooperating with us." Captain Hernandez turned on his belt recorder and asked Filemon "how old he was" and "if he was going to tell me what happened today." Filemon responded, "What [do] you want to know?" Captain Hernandez answered, "Everything." Filemon proceeded to give a full statement.

{13} At no time did Captain Hernandez advise Filemon of his constitutional rights. When asked why he did not advise Filemon of his constitutional rights, Captain Hernandez said, "I didn't really think about it. I wasn't sure what his involvement was . . . if he was the shooter or if he wasn't the shooter. I just wanted to see what information he had." Once he obtained Filemon's statement, Captain Hernandez told Filemon that he would be detained. The State concedes that the statement elicited by Captain Hernandez is inadmissible.

{14} Captain Hernandez then asked Filemon to make a statement to Detective Castillo. Detective Castillo took Filemon and his mother to the interview room, where he read Filemon his *Miranda* warnings. Before continuing the interview, Detective

5

Castillo told Filemon that he was "finishing up." Detective Castillo characterized the *Miranda* warnings as a "formality," and instructed Filemon and his mother to sign the written waiver of rights, which they did. Detective Castillo explained that their conversation would "go the same way" as the conversation with Captain Hernandez, but in greater detail. Detective Castillo did not inform Filemon that the statement he had just given to Captain Hernandez would not be admissible at trial. Detective Castillo then obtained a second statement, which included the same content as the statement elicited by Captain Hernandez.

{15}     At the conclusion of the suppression hearing, the district court determined that the statement in Supervisor Medina's office was inadmissible because Filemon was not advised of his statutory right against self-incrimination and did not knowingly, voluntarily, and intelligently waive his rights under Section 32A-2-14(D). The district court also suppressed both statements elicited at the Silver City Police Department, finding that the pre-*Miranda*, unwarned statement was inadmissible; Detective Castillo's midstream *Miranda* warnings were constitutionally inadequate under *Seibert*, 542 U.S. at 604; and neither statement was made subject to a valid waiver under Section 32A-2-14(D).

{16}     The State appeals the district court's order to suppress two statements: (1) the

6

statement in Supervisor Medina's office; and (2) the post-warning statement to Detective Castillo. On appeal, the State contends that Section 32A-2-14 does not preclude the admission of the statement and that Section 32A-2-14 applies only when law enforcement places a child in investigatory detention. The State also contends that the post-*Miranda* statement to Detective Castillo is admissible because it was voluntary, uncoerced, and made subject to a valid waiver. Because the charges expose Filemon to a potential sentence of life imprisonment, we have jurisdiction to decide the appeal under Rule 12-102(A)(1) NMRA. *State v. Smallwood*, 2007-NMSC-005, ¶ 11, 141 N.M. 178, 152 P.3d 821.

## III.    STANDARD OF REVIEW

{17}    An appeal of a district court's suppression ruling raises a mixed question of fact and law. *State v. Wyatt B.*, 2015-NMCA-110, ¶ 16, 359 P.3d 165. We review "whether the law was correctly applied to the facts," viewing the facts "in a manner most favorable to the prevailing party." *State v. Jason L.*, 2000-NMSC-018, ¶ 10, 129 N.M. 119, 2 P.3d 856 (internal quotation marks and citation omitted). We defer to the district court's findings of fact so long as they are supported by substantial evidence. *Id.* "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wyatt B.*, 2015-NMCA-110, ¶ 16 (internal

7

quotation marks and citation omitted). "The district court's application of the law to the facts is a question of law that we review de novo." *Id.*

## IV. DISCUSSION

{18}    In determining the admissibility of the statements, we begin with the fundamental principles against self-incrimination. The right against self-incrimination is borne of the Fifth Amendment and applied to the states through the Fourteenth Amendment. *See Malloy v. Hogan*, 378 U.S. 1, 8 (1964). The Fifth Amendment may be invoked in response to "official questions . . . in any . . . proceeding, civil or criminal, formal or informal, where the answers might incriminate . . . in future criminal proceedings." *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (internal quotation marks and citation omitted).

{19}    In *Miranda v. Arizona*, the United States Supreme Court adopted a warnings-based approach for determining the admissibility of statements elicited in police custody. *See* 384 U.S. 436, 476 (1966). Prior to police questioning, police must advise the person of the right to remain silent, that any statement made may be used as evidence against him or her, and of the right to an attorney. *Id.* at 444. It is only through these warnings, and an awareness that anything said can and will be used against the person in court, "that there can be any assurance of real understanding and

8

intelligent exercise of the privilege." *Id.* at 469. Of particular importance is the notion that statements that would otherwise be considered voluntary must be excluded for failure to warn. *Dickerson v. United States*, 530 U.S. 428, 443-44 (2000).

{20}	In addition to the constitutional protections against self-incrimination, Section 32A-2-14 provides a statutory right against self-incrimination to children suspected of delinquent conduct. *Javier M.*, 2001-NMSC-030, ¶ 41. Section 32A-2-14(C) provides, in part:

> No person subject to the provisions of the Delinquency Act who is alleged or suspected of being a delinquent child shall be interrogated or questioned without first advising the child of the child's constitutional rights and securing a knowing, intelligent and voluntary waiver.

In *Javier M.*, we explained that "Section 32A-2-14 is not a mere codification of *Miranda*, but was intended instead to provide children with greater statutory protection than constitutionally mandated." *Javier M.*, 2001-NMSC-030, ¶¶ 30, 32. "Instead of using *Miranda* triggering terms such as 'custody' or 'custodial interrogation,' the Legislature used much broader terms, such as, 'alleged,' 'suspected,' 'interrogated,' and 'questioned.' " *Id.* ¶ 29 (quoting Section 32A-2-14(C)). It is well-settled that unwarned statements that are admissible under *Miranda* may be inadmissible under Section 32A-2-14. *See, e.g., id.* ¶ 48; *State v. Antonio T.*,

9

2015-NMSC-019, ¶¶ 15-17, 352 P.3d 1172.

{21} Questioning officials must exercise greater vigilance with child suspects due to their "[l]ack of experience, perspective, and judgment," and their diminished "ability to recognize and avoid various choices detrimental to them." *State v. Rivas*, 2017-NMSC-022, ¶ 43, 398 P.3d 299 (citing *J.D.B. v. North Carolina*, 564 U.S. 261, 272 (2011) (internal quotation marks omitted)). "That a child will experience police questioning in many ways distinct from an adult is a 'commonsense reality.' " *Id.* (citation omitted). Even with respect to adult offenders, the United States Supreme Court has recognized that the pressure of interrogation "may induce a frighteningly high percentage of people to confess to crimes they never committed." *Id.* (internal quotation marks and citation omitted). These concerns for truth and reliability apply with greater force when the suspect is a child. *See Javier M.*, 2001-NMSC-030, ¶ 37. Mindful of the foregoing principles against self-incrimination, and with particular attention to Filemon's youth, we analyze the admissibility of the contested statements.

**A.  Section 32A-2-14 Prohibits the Admission of an Unwarned Statement to Probation Officers in a Subsequent Prosecution**

{22} The question of whether a child's unwarned statement in response to questioning by his probation officer is admissible under Section 32A-2-14 is a matter

10

of statutory interpretation to be reviewed de novo. *See Antonio T.*, 2015-NMSC-019, ¶ 12. To determine if a statement is admissible under Section 32A-2-14, we first establish "the minimum constitutional guarantees available to the Child." *Javier M.*, 2001-NMSC-030, ¶ 11. We then determine "what, if any, additional protections are available to the Child under the statute." *Id.*

{23}     With respect to these minimal constitutional guarantees, the *Miranda* warnings are typically required in circumstances of custodial interrogation. *Id.* ¶¶ 14-15. Our cases hold that "[a]n individual is subject to custodial interrogation when he or she lacks the freedom to leave to an extent equal to formal arrest." *Id.* ¶ 18. The threshold question in determining whether a person is in custodial interrogation is whether there were "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

{24}     While the United States Supreme Court has yet to consider the Fifth Amendment rights of juvenile probationers, it considered the rights of adult probationers in *Murphy*, 465 U.S. at 422. The *Murphy* Court determined that probation officers are not required to provide *Miranda* warnings to adult probationers who are not in custody. *Id.* at 429-30, 433. Because probation meetings do not

11

routinely give rise to the coercive pressures of a custodial interrogation, an adult probationer's unwarned statements to a probation officer can be admitted in a subsequent criminal prosecution. *See id.* at 422, 433, 440. The Fifth Amendment forbids, however, a state from compelling self-incriminating statements as a condition of probation and then using the statements to prosecute a new offense. *Id.* at 435 n.7; *cf. United States v. Von Behren*, 822 F.3d 1139, 1141 (10th Cir. 2016) (concluding that the Fifth Amendment was violated by requiring a probationer to submit to a lie detector test as a condition of supervised release and threatening to revoke it for invoking the privilege against self-incrimination). Here, because neither party contends that the events at the juvenile probation office amounted to a custodial interrogation, or that the statement was compelled over Filemon's objection, we assume, without deciding, that the statement is admissible under the Fifth Amendment. This does not preempt our analysis of whether the statement is admissible under Section 32A-2-14, because the statute bestows greater protection to youth than the Fifth Amendment requires. *Javier M.*, 2001-NMSC-030, ¶¶ 24, 37.

{25}    Unlike *Miranda*, "Section 32A-2-14 does not require that a child be subject to custodial interrogation in order for the protections of the statute to come into force." *Javier M.*, 2001-NMSC-030, ¶ 32. We have interpreted Section 32A-2-14 as requiring

12

a child to be warned of the statutory right against self incrimination when subject to a limited scope encounter known as an "investigatory detention." *Javier M.*, 2001-NMSC-030, ¶ 38.

{26} Investigatory detentions are "substantially less coercive than custodial interrogations." *Id.* ¶ 19. For example, a traffic stop is an investigatory detention because it is brief, temporary, and "not so inherently coercive" as to compel a typical person to self-incriminate. *Id.* We first determined that a child was subject to an investigatory detention in the context of police questioning. *See id.* ¶ 40. In *Javier M.*, a police officer removed a child from a party to question him about underage drinking. *Id.* ¶¶ 2-4, 20. There was no custodial interrogation because the encounter was not coercive and the child was not "overpowered by police presence." *Id.* ¶¶ 20-21. Nevertheless, the child was (1) suspected of delinquent act; (2) questioned; and (3) not free to leave. *Id.* ¶ 20. Given these circumstances, we determined that the child was in investigatory detention and entitled to be advised of his right to remain silent. *Id.* ¶ 38.

{27} In addition to being less coercive than custodial interrogations, investigatory detentions are less adversarial. *Id.* ¶ 22. Unlike custodial interrogations, investigatory detentions are not "police dominated" and the child is not "overpowered by police

presence." *Id.* ¶ 21 (internal quotation marks and citation omitted). There is no requirement that the child be "swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion . . . so that the individual feels under compulsion to speak." *Antonio T.*, 2015-NMSC-019, ¶ 14 (omission in original) (alteration, internal quotation marks, and citation omitted). Rather, a child is subject to an investigatory detention when merely suspected of having committed an offense and questioned in circumstances under which the child is not free to leave. *See Javier M.*, 2001-NMSC-030, ¶¶ 34-35, 38.

{28} While the district court did not expressly recognize that Filemon was in an investigatory detention in Supervisor Medina's office, it did find that McNiel was "holding" Filemon until police arrived, that McNiel was actively investigating Filemon, and that the statement was elicited. There was substantial evidence to support these findings, which lead us to conclude that Filemon was in investigatory detention. The district court also concluded that Section 32A-2-14 is not limited to statements elicited by police officers. We agree.

{29} Filemon was suspected of committing a new offense, other than that for which he was on probation. *See Javier M.*, 2001-NMSC-030, ¶¶ 34-35 ("As a prerequisite

14

to requiring that a child be advised of his or her rights under Subsection (C), the Child must be either 'alleged' or 'suspected' of being a delinquent child."). Whether a child was 'suspected' of delinquent activity for purposes of Section 32A-2-14(C) is evaluated using an objective standard. *Javier M.*, 2001-NMSC-030, ¶ 35. Upon hearing Filemon's statement in the lobby, it was objectively reasonable for McNiel and Supervisor Medina to conclude that Filemon had committed a new delinquent offense. This is obvious given that McNiel was aware of a shooting and that a suspect was acquainted with Filemon. Thus, Filemon was suspected of committing a delinquent act by the time the probation officers escorted him to Supervisor Medina's office. *See id.* ¶¶ 20-21.

{30} Once in Supervisor Medina's office, Filemon was questioned about a new offense. *See Antonio T.*, 2015-NMSC-019, ¶ 27. McNiel asked, "[A]re you here to confess about the drive-by shooting," a question which was reasonably likely to reveal incriminating information. *See Javier M.*, 2001-NMSC-030, ¶ 52 (Minzner, J., specially concurring). This interaction went beyond a routine meeting regarding Filemon's compliance with his conditions of probation and became investigatory when McNiel prompted Filemon to reveal incriminating information about an offense for which he was not already on probation. *See, e.g., State v. Taylor E.*, 2016-NMCA-

15

100, ¶¶ 23-24, 385 P.3d 639 (holding that a probation officer was not required to give *Miranda* warnings before asking routine questions relating to probationary status). Supervisor Medina shared the information with the police, thereby serving as a conduit to the criminal investigation.

{31}     Filemon was not free to leave Supervisor Medina's office. *Javier M.*, 2001-NMSC-030, ¶ 38 (stating that Section 32A-2-14(C) applies "when a child is seized pursuant to an investigatory detention and not free to leave"). To determine whether a child is free to leave, we examine "all of the factual circumstances," including "(1) the conduct of the police, (2) the person of the individual citizen, and (3) the physical surroundings of the encounter." *Jason L.*, 2000-NMSC-018, ¶ 15 (internal quotation marks and citation omitted). Filemon's youth is of importance in determining whether he was free to extract himself from the encounter. *See id.* ¶ 18; *see also Javier M.*, 2001-NMSC-030, ¶ 37 (citing children's "immaturity and susceptibility to intimidation" as a reason why they must be advised of their rights during an investigatory detention); *Rivas*, 2017-NMSC-022, ¶¶ 42-43 (describing a child's vulnerability in the context of interrogation).

{32}     While Filemon entered the probation office of his own volition, the nature of the encounter changed when he made the initial voluntary statements in the lobby.

16

The probation officers isolated Filemon by escorting him through a locked door and down a hallway to a supervisor's office in the interior of the building. *See Javier M.*, 2001-NMSC-030, ¶ 18. Though Filemon was not a stranger to the probation office, he knew that police were on their way. We are unpersuaded that a child in Filemon's position would feel free to extract himself from this situation, and for this reason conclude that he was not free to leave.

{33} Section 32A-2-14 is not limited to police questioning, as the State asserts. The presence of a police officer is relevant, but not dispositive, to determining whether a child is in investigatory detention. *See Antonio T.*, 2015-NMSC-019, ¶¶ 24-27. In *Antonio T.*, we held that Section 32A-2-14 applied to questioning by a school principal. *Id.* ¶ 27. The presence of a police officer added an element of coercion that is not usually present in a school disciplinary proceeding; but perhaps more importantly, granted access to evidence used to prosecute a delinquent offense. *Id.* The protections of Section 32A-2-14 were brought to bear because the evidence was used to prosecute the child. The same result pertains when the statement is elicited by probation officers and used to prosecute a new offense.

{34} The Court of Appeals held that a child's unwarned statements to his probation officer were admissible for the limited purpose of a probation revocation proceeding

in *Taylor E.*, 2016-NMCA-100, ¶ 19. As the State contends here, the Court of Appeals noted that requiring probation officers to issue *Miranda* warnings could "transform[] a relationship intended to be rehabilitative . . . into an adversarial relationship[.]" *Id.* ¶¶ 47-48, 65. The admission of the statements did not turn on the nature of the relationship, however. *See id.* ¶¶ 14-15. Rather, the statements were admissible because they were elicited in a routine meeting and not used to prosecute a new offense. *See id.* ¶¶ 23-24. The Court of Appeals emphasized the distinction between probation revocation hearings, in which the prosecution has already occurred, and a new prosecution in which the Fifth Amendment is at stake. *Id.* ¶¶ 14-15. Unlike *Taylor E.*, Filemon's encounter with the probation officers was far from routine, and the statement is being introduced to prosecute Filemon for a new offense. This distinguishes the situation from the introduction of a statement in a probation revocation hearing. It is the use of the statement to prosecute a new offense that implicates fundamental concerns against self-incrimination.

{35}    We conclude that Filemon was subject to an investigatory detention for purposes of Section 32A-2-14, and the unwarned statement to his probation officers cannot be used to prosecute a new offense. The absence of a police officer does not bar this result where the statements were elicited in an investigatory detention and

18

offered in a new criminal case. For this reason, we affirm the district court's suppression of the statement.

**B.     The Post-*Miranda* Statement Is Inadmissible Under *Seibert***

{36}     Filemon was transported from the juvenile probation office to the Silver City Police Department. At the police department, Captain Hernandez was informed that Filemon was there to speak to him. Captain Hernandez turned on his recorder and escorted Filemon and his mother to his office, where he proceeded to interview Filemon in the presence of the detective assigned to the case, Detective Castillo. Captain Hernandez did not inform Filemon of his *Miranda* rights. Once Captain Hernandez elicited a full, detailed statement from Filemon, he informed Filemon that he was going to be detained. Immediately following this interview, Captain Hernandez directed Filemon to repeat the statement to Detective Castillo. Detective Castillo took Filemon and his mother into the interview room, gave Filemon his *Miranda* warnings, and obtained a second, detailed statement.

{37}     The district court suppressed both statements elicited at the police department. The State appeals the suppression of the post-*Miranda* statement. We affirm the district court's suppression of the statement because the midstream *Miranda* warning was ineffective in informing Filemon of his *Miranda* rights. *Seibert*, 542 U.S. at 617.

{38} It is well-established that before any person is the subject of a custodial police interrogation, the suspect must be advised of his or her *Miranda* rights. 384 U.S. at 444. *Miranda* is intended to protect a suspect's constitutional right against self-incrimination and requires that, for a statement to be admissible at trial, the suspect be advised of the right and the officer obtain a knowing, intelligent, and voluntary waiver of the suspect's right to self-incrimination. *Id*. at 468. A valid waiver is made free from "intimidation, coercion, or deception" and "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

{39} It is undisputed that Filemon was subject to a custodial interrogation when Captain Hernandez interviewed him, triggering the requirement of *Miranda* warnings. *See* 384 U.S. at 467. Because Filemon was at this point firmly in police custody and not provided with his *Miranda* warnings, the State concedes that the unwarned statement to Captain Hernandez was properly suppressed. However, the State argues that the district court erred in suppressing Filemon's post-*Miranda* statement to Detective Castillo. The State cites *Oregon v. Elstad*, and argues that Filemon's post-*Miranda* statement is admissible because his pre- and post-*Miranda* statements were voluntary. 470 U.S. 298, 309 (1985) (stating that *Miranda* does not preclude the

20

admission of a statement that is unwarned but voluntary and uncoerced).

{40}    We disagree. First, the State places improper emphasis on the voluntariness of the statements elicited at the police station. *See Dickerson*, 530 U.S. at 436 (overruling a statute that eliminated *Miranda*'s warning requirement and designated "voluntariness as the touchstone of admissibility"). The touchstone question is not whether a statement was voluntary, but whether the *Miranda* warnings were adequate to inform the suspect of his or her rights. *See Seibert*, 542 U.S. at 608-09. The *Miranda* warnings given to Filemon were not adequate to inform him of his rights. Second, the manner in which the *Miranda* warnings were given rendered the statement elicited by Detective Castillo presumptively coerced. Therefore, the district court's suppression of the statements was proper.

{41}    The United States Supreme Court has decided two cases relevant to the discussion of whether a warned statement is admissible following an unwarned statement: *Elstad* and *Seibert*.

{42}    The question in *Elstad* was whether a suspect's post-*Miranda* statement was admissible after the suspect had already made an incriminating statement to a police officer. 470 U.S. at 300. In *Elstad*, two officers went to a suspect's house with an arrest warrant. *Id.* One officer sat down with the suspect in his living room and asked

21

if the suspect knew the victim. *Id.* at 301. The suspect said he did, and was aware that the victim had been burglarized. *Id.* When the officer stated that he felt that the suspect was involved, the suspect stated: "Yes, I was there." *Id.* (internal quotation marks omitted). The suspect had not been advised of his rights. *Id.* The officer did not continue to question the suspect, but instead escorted the suspect to a patrol car, and took him to the sheriff's headquarters. *Id.* Approximately an hour later, the suspect was given his *Miranda* warnings. *Id.* The suspect said he understood his rights, still wished to speak to the officers, and then gave a full statement. *Id.* at 301-02. Subsequently, the suspect was charged with burglary and moved to suppress his second statement, arguing that the first unwarned statement "let the cat out of the bag" and tainted his second statement. *Id.* at 302 (internal quotation marks and citation omitted). The *Elstad* Court held that while the first statement was inadmissible, the second statement was admissible, because neither statement was coerced, and the second statement was obtained after careful administration of *Miranda* warnings and after a voluntary waiver of the suspect's rights. *Id.* at 310-11, 17-18.

{43}    The Court revisited the question of whether a second, warned statement was admissible after a first, unwarned statement in *Seibert*. 542 U.S. at 606-07. The

22

plurality in *Seibert* limited *Elstad* to its facts and held that the relevant question was not the voluntariness of the two statements, but whether the *Miranda* warnings given after the first statement were effective in informing the suspect of her constitutional rights. *Seibert*, 542 U.S. at 615. In *Seibert*, the suspect was arrested, taken to the police station, and questioned for an extended period of time prior to being given her *Miranda* warnings. *Id.* at 604-05. The police officer elicited a full confession from the suspect. *Id.* The suspect was then given a twenty-minute break, Mirandized, and questioned a second time by the same police officer in the same location. *Id.* at 604-05, 616. In the second interview, the officer asked the suspect to repeat the information she had given in her first statement and reminded the suspect of what she had said prior to being advised of her rights. *Id.*

{44}    In distinguishing *Seibert*'s facts from *Elstad*'s, the Court listed facts relevant to determining whether midstream *Miranda* warnings are effective in informing a suspect of his or her constitutional rights:

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second [rounds of interrogation], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

23

*Seibert*, 542 U.S. at 615. The *Seibert* Court determined that the first and second interviews were effectively continuous: both were held in the same location, the break between the first and second interview was limited, and the police officer referenced statements the suspect made during the first interview while conducting the second interview. *Id.* at 604-05, 616-17. Furthermore, the officer did not remedy the initial failure to warn by informing the suspect that her first statement could not be used against her at trial. *Id*. at 616. The *Seibert* Court held that the suspect's constitutional rights were violated because the *Miranda* warnings given were ineffective in informing the suspect that she had a genuine right to remain silent and therefore, the post-*Miranda* statement was inadmissible. *Seibert*, 542 U.S. at 617.

{45}    In distinguishing the *Seibert* interrogation from the interrogation in *Elstad*, the *Seibert* Court noted that the *Elstad* questioning was "a new and distinct experience," such that "the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission." *Seibert,* 542 U.S. at 616. The scope of the pre-*Miranda* questioning in *Elstad* and *Seibert* was categorically different. In *Elstad*, the police officer asked the suspect one question, and the interrogation immediately ceased when the suspect gave an incriminating statement. 470 U.S. at 301-02. In *Seibert*, the suspect was questioned extensively and gave a full

24

confession before being Mirandized. 542 U.S. at 604-05.

{46}    This case bears notable similarities to *Seibert*. Like *Seibert*, Filemon was questioned extensively and gave a full confession before he was given his *Miranda* warnings. After Detective Castillo gave Filemon the *Miranda* warnings, Detective Castillo told Filemon to "start from the beginning like you did a while ago," asking him to repeat his prior confession, and ensuring that the content of the second statement completely overlapped with the content of the first statement. The lack of break between the first and second interviews, and the fact that Detective Castillo was present for both, further contributed to the continuous nature of the two interviews. Additionally, rather than taking any curative measures to ensure that Filemon understood that the pre-*Miranda* confession he gave to Captain Hernandez was inadmissible, Detective Castillo did the opposite and told Filemon and his mother that the *Miranda* warnings were merely a "formality." The *Seibert* Court recognized that "when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." 542 U.S. at 613-14 (alteration, internal quotation marks, and citation omitted). This is precisely what happened here. The *Miranda* warnings given

25

to Filemon by Detective Castillo were not adequate to inform him of his constitutional rights as required by *Miranda* jurisprudence.

{47} Given the manner in which the interview was conducted, it would have been unreasonable for Filemon to believe that he had a genuine right to remain silent. While Filemon's mother was present, there is no evidence that she herself understood the midstream *Miranda* warnings. She did not counsel or advise Filemon during either of the interviews and left it up to him to decide whether he wanted to answer the officers' questions. Filemon had already made a full confession to Captain Hernandez before he was advised of his rights. Furthermore, when Detective Castillo began to interview Filemon, he told Filemon that he was "gonna go the same way" as Captain Hernandez and that he was just "finishing up" where Captain Hernandez left off, giving the impression that the interview was just a continuation of the interview conducted by Captain Hernandez. Detective Castillo did not make it clear that Filemon could stop talking. Because of the coercive tactics employed by Captain Hernandez and Detective Castillo, Filemon was not provided with a "real choice between talking and not talking." *See id.* at 601. The State did not meet its burden in proving that the midstream *Miranda* warnings were sufficient to inform Filemon of his right against self-incrimination.

26

{48} The *Miranda* warnings are not a mere formality. *Miranda* warnings given after a confession are likely to be "ineffective in preparing the suspect for successive interrogation, close in time and similar in content." *Id.* at 613. Police must take the utmost care to ensure that the suspect not only understands the meaning of the *Miranda* warnings, but also understands the nature of the rights being abandoned and the consequences of the decision to abandon them. *See Moran*, 475 U.S. at 421. *Miranda* warnings must be given in a manner that is clearly sufficient to grant the suspect an awareness of the right so the suspect can make a knowing, intelligent and voluntary choice to speak. *See Miranda*, 384 U.S. at 467. The tactics employed by Captain Hernandez and Detective Castillo were presumptively coercive and eviscerated the protections envisioned by *Miranda*, rendering the warnings—when they were finally given—ineffective to inform Filemon that he had a right not to incriminate himself. We uphold the district court's determination that the statement elicited by Detective Castillo is inadmissible. Because the statement is inadmissible as a matter of federal law, it is also inadmissible under Section 32A-2-14. *See Javier M.*, 2001-NMSC-030, ¶ 11.

{49} We affirm the district court's suppression of the two contested statements and remand for further proceedings consistent with this opinion.

{50}    **IT IS SO ORDERED.**

_____
                              **BARBARA J. VIGIL, Justice**

**WE CONCUR:**

_____
**JUDITH K. NAKAMURA, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**CHARLES W. DANIELS, Justice**

28