This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**No. A-1-CA-37612**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**LONDON JAMES WORD a/k/a LONDEN J. WORD a/k/a LONDON WORD a/k/a CHUBBS WORD a/k/a LONDON J. WOOD,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Jacqueline D. Flores, District Judge**

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**MEDINA, Judge.**

**{1}** Defendant London Word appeals his convictions for one count of second-degree murder, contrary to NMSA 1978, Section 30-2-1(B) (1994), and two counts of tampering with evidence, contrary to NMSA 1978, Section 30-22-5 (2003), contending that the district court erred in denying his motions to suppress: (1) evidence obtained from the

warrantless search of the Victim's apartment; (2) statements Defendant made at the police station; and (3) statements Defendant made during his post-trial sixty-day diagnostic evaluation. We affirm.

**BACKGROUND**

{2}     Early Monday morning, November 14, 2016, Defendant broke into his mother's (Cannon) home and told her he was supposed to give drugs to his "homeboy" (the Victim) in exchange for staying at the Victim's apartment. Defendant said that he and the Victim argued and fought because the Victim wanted more drugs than Defendant provided. Defendant stated that he "cut" the Victim and thought the Victim was dead. Cannon called the Albuquerque Police Department after Defendant left and stated that Defendant was causing a disturbance at her home and she wanted him removed. After Defendant left but before police arrived, Cannon called police again after seeing Defendant repeatedly driving in front of Cannon's home and eventually parking two houses away from hers.

{3}     Officers Jonathan McDonnell and Carlton Adams were dispatched to Cannon's home in reference to a possible domestic dispute. While en route to Cannon's home, Officer McDonnell discovered Defendant had an outstanding petty misdemeanor warrant. The officers saw Defendant walking by a vehicle parked not far from Cannon's home that matched the description of the vehicle provided by Cannon.

{4}     The officers identified themselves and asked Defendant if he would be willing to speak to them and Defendant agreed. Unaware that Defendant told Cannon that he had stabbed someone, the officers asked Defendant where he was going and what had gone on between himself and Cannon that morning. Defendant responded that they had a rocky relationship and that he had stopped by Cannon's house to use her phone. Officer McDonnell asked Defendant about the lacerations and abrasions he noticed on his knuckles. Defendant responded that he had gotten into an altercation with several individuals on Central Avenue the night before. The officers advised Defendant to avoid going to Cannon's home and to take care of his outstanding misdemeanor warrant, and allowed Defendant to drive off.

{5}     Cannon then approached the two officers, who had not yet left the area. Cannon told the officers that when Defendant broke into her home, he was screaming and crying, had blood all over his hands and feet, and had told her that he had killed someone at 528 Mesilla St. SE in the "bottom left" apartment, which was later identified as apartment A. Officer McDonnell radioed for a welfare check for the apartment at 528 Mesilla Street S.E., and Officer Adams left to locate Defendant.

{6}     Officer Wolffbrandt was one of the officers dispatched to conduct the welfare check on the apartment located at 528 Mesilla Street S.E. The officers knocked and announced their presence and entered the apartment. Once inside the apartment, Officer Wolffbrandt looked into the bedroom and observed blood "all across the floor." He did not enter the bedroom to avoid disturbing the blood on the floor and its

evidentiary value. When he looked into the bedroom, Officer Wolffbrandt could only see one corner of the closet and "did not see anything that appeared to be a body." The officers then walked out of the apartment.

**{7}** About ten minutes later, concerned that he had not properly checked the closet, Officer Wolffbrandt reentered the apartment because he thought that "there could be still be a person inside that room, whether unconscious or otherwise." Officer Wolffbrandt discovered a body later identified as that of Lucas Bazan in the closet.

**{8}** Meanwhile, Officer Adams located Defendant outside his car, which had run out of gas, at the intersection of Morris Street N.E. and Domingo Road N.E. (second curbside encounter). Defendant opened his driver's side door as Officer McDonnell walked towards him. Officer Adams stood at the front of Defendant's vehicle and neither officer drew their firearms. Using a conversational tone, Officer McDonnell informed Defendant that since their last encounter, Cannon told them that he had entered her house and "made some statements as to hurting people last night [near] Mesilla." When asked if that sounded familiar, Defendant responded that he did not know where Mesilla was. Officer McDonnell asked Defendant what happened between himself and Cannon earlier that morning. During the first three minutes of the encounter, Defendant stood outside his car, eating chips while responding to questions. Defendant then sat down in the driver's seat facing Officer McDonnell with his feet outside the car for the remainder of the curbside encounter. Officer McDonnell again asked Defendant how he had gotten the injuries on his hand. Defendant responded that he had gotten into an altercation with several strangers the night before near Central Avenue and San Mateo Boulevard.

**{9}** Officer McDonnell then received instructions to transport Defendant to the police department because detectives wanted to talk with Defendant. Officer McDonnell told Defendant that he needed to come with him to the police station to speak with detectives. Defendant walked to Officer McDonnell's car without incident where he was placed in handcuffs and driven to the police station. While en route to the police station, Officer McDonnell was informed that a body had been located in the apartment.

**{10}** Detectives Matthew Caplan and T. Juarez interviewed Defendant. The interview began as follows:

> Detective Caplan:   Today's date is November 14, 2016. It is approximately 1545 at the main police station. This is Detective Caplan. With me is Detective Juarez. Reference Case No. 16 107817. We are going to be interviewing London Word with regard to the homicide that occurred at 528 Mesilla Southeast. Hey. All right. You good? Bathroom?
>
> Defendant:   Yes sir.
>
> Detective Caplan:   All right. So London, do you know why you're here?
>
> Defendant:   Yes and no.

Detective Caplan:　　Yes and no.

**{11}**　Detective Caplan next asked Defendant for identifying information including his name, date of birth, phone number, address, and social security number. Detective Caplan then advised Defendant that the police were investigating a homicide and informed Defendant of his *Miranda* rights. Defendant answered the detectives' questions during which he admitted to stabbing the Victim multiple times and "slash[ing]" the Victim's throat.

**{12}**　Prior to trial, defense counsel filed a motion to suppress physical and testimonial evidence, including (1) evidence obtained during the warrantless search of the Victim's apartment; and (2) the statements Defendant made at the police station contending that the *Miranda* warnings given to him were ineffective under *Missouri v. Seibert*, 542 U.S. 600 (2004).

**{13}**　After presiding over a hearing on the motions, the district court ruled that Defendant lacked standing to challenge the warrantless search of the apartment and alternatively, that the emergency assistance exception to the warrant requirement applied to both of the warrantless entries into the apartment. With regard to testimonial evidence, the district court ruled that Defendant's statements to Officers McDonnell and Adams during the second curbside encounter began as a "consensual meeting," but transformed into a custodial interrogation when the officers began to question Defendant about the injuries to his hands. However, the district court did not suppress the statements Defendant made to the detectives at the police station, explaining that unlike the facts in *Seibert*, where a full confession was obtained prior to the defendant's *Miranda* warning, the detectives in this case only asked Defendant for identifying information prior to informing Defendant of his *Miranda* rights.

**{14}**　A jury convicted Defendant of second-degree murder and two counts of tampering with evidence. This appeal followed. Because this is a memorandum opinion, we reserve discussion of additional facts where necessary to our analysis.

## DISCUSSION

### Standard of Review

**{15}**　"In reviewing a [district] court's denial of a motion to suppress, [appellate courts] observe the distinction between factual determinations[,] which are subject to a substantial evidence standard of review and application of law to the facts, which is subject to de novo review." *State v. Hubble*, 2009-NMSC-014, ¶ 5, 146 N.M. 70, 206 P.3d 579 (alteration, internal quotation marks, and citation omitted). "We view the facts in the manner most favorable to the prevailing party and defer to the district court's findings of fact if substantial evidence exists to support those findings." *State v. Urioste*, 2002-NMSC-023, ¶ 6, 132 N.M. 592, 52 P.3d 964.

## A. Defendant Lacked Standing to Challenge the Search of the Victim's Apartment

**{16}** Defendant asserts that the district court erred in denying his motion to suppress the evidence obtained from the warrantless search of the Victim's apartment. Specifically, Defendant contends he had standing to challenge the search because he was an overnight guest who "spent the Friday night before the murder, which took place on Sunday, at the apartment" and "left his belongings there, and he did his laundry there."

**{17}** "Both the Fourth Amendment to the United States Constitution and Article II, Section 10, of the New Mexico Constitution protect the right of the people to be free from unreasonable searches and seizures." *State v. Gutierrez*, 2004-NMCA-081, ¶ 6, 136 N.M. 18, 94 P.3d 18. These protections, however, are "only conferred when individuals have a reasonable expectation of privacy in the place to be searched or the thing to be seized." *State v. Yazzie*, 2019-NMSC-008, ¶ 17, 437 P.3d 182; *see also State v. Adame*, 2020-NMSC-015, ¶ 9, 476 P.3d 872 ("[Article II, Section 10's] protection from governmental intrusion is conferred only when a person has a reasonable expectation of privacy in that which is searched or seized."). Thus, "[t]he touchstone of search and seizure analysis is whether a person has a constitutionally recognized expectation of privacy." *State v. Ryon*, 2005-NMSC-005, ¶ 23, 137 N.M. 174, 108 P.3d 1032.

**{18}** A defendant seeking to suppress evidence seized from the warrantless entry and search of another person's residence must "show he had a legitimate expectation of privacy in the [residence]." *State v. Crocco*, 2014-NMSC-016, ¶ 16, 327 P.3d 1068. "Whether a defendant has standing involves two inquiries: (1) whether the defendant had an actual, subjective expectation of privacy in the premises searched; and (2) whether the defendant's subjective expectation is one that society is prepared to recognize as reasonable." *State v. Zamora*, 2005-NMCA-039, ¶ 10, 137 N.M. 301, 110 P.3d 517 (alteration, internal quotation marks, and citation omitted). In determining whether a defendant has a legitimate expectation of privacy in another person's home, "[w]e must examine the entire record surrounding the arrest, search and seizure." *Crocco*, 2014-NMSC-016, ¶ 18 (internal quotation marks and citation omitted).

**{19}** However, "[i]n order for a court to conclude that [a d]efendant had a constitutional basis for objecting to the search of another person's house, there must be evidence that [the d]efendant was a guest with permission to be there." *Id.* ¶ 19. It is not enough for the defendant to subjectively believe that he has permission to be in the host's home as "actual evidence of permission is required." *Id.* ¶ 20.

**{20}** The record does not establish that the Victim granted Defendant permission to be in the apartment such that he acquired standing to contest the warrantless search of the apartment. To the contrary, during his police station interview, Defendant told the detectives that he had been living "out in the streets . . . on and off" since he got out of prison on August 8, 2016, and "lately . . . [for] about 2½ to 3 weeks." There is simply no

evidence in the record demonstrating that the Victim gave Defendant permission to stay in the Victim's apartment on Monday, November 14, 2016—the date on which the officers made their warrantless entry into the Victim's apartment. Without such evidence, he is unable to demonstrate that he has a legitimate expectation of privacy in the Victim's apartment. *Crocco*, 2014-NMSC-016, ¶ 20.

**{21}** To the extent Defendant directs this Court to: (1) the purported agreement in which the Victim gave Defendant permission to stay in his apartment over the weekend in exchange for drugs; (2) that Defendant stayed at the Victim's apartment on the Friday night before the murder and Defendant left a bag of his belongings in the apartment when he went out to look for drugs on Saturday; and (3) that Defendant did a load of laundry in the Victim's apartment, we find this evidence insufficient to confer standing on Defendant.

**{22}** At best, Defendant's aforementioned evidence, if believed, merely establishes that the Victim gave Defendant permission to stay in the apartment with access to the washing machine for a defined period of time over the weekend. There is no evidence that the arrangement included any terms by which Defendant could stay at the apartment past the weekend, and officers did not enter the apartment until Monday. Even if under the terms of the agreement Defendant could have stayed Sunday night in the apartment with a Monday morning departure date, according to Defendant, his permission to spend the weekend in the apartment was conditioned on providing the Victim with drugs—and according to Defendant, on Sunday, the deadly altercation ensued as a result of his failure to provide the amount of drugs the Victim felt entitled to.

**{23}** Moreover, the evidence of the purported agreement between the Victim and Defendant reveal that Defendant lacked the ability to exclude others from the apartment and that he lacked continuous access to the apartment. *See State v. Leyba*, 1997-NMCA-023, ¶ 16, 123 N.M. 159, 935 P.2d 1171 ("Under the Fourth Amendment, a person may have standing to challenge the search of a place she does not own or occupy if she has the right to exclude others from the searched premises or has continuous access to the searched premises combined with a possessory interest in an item seized there."). By his own admission, Defendant made two failed attempts to make contact with the Victim at his apartment on Saturday and after receiving no response, slept elsewhere. The conditional nature of Defendant's ability to stay in the Victim's apartment and his lack of continuous access to the apartment played out on Sunday when the Defendant looked through a window and saw the Victim "locking and clos[ing] the door" on him.

**{24}** Considered as a whole, the record does not establish that Defendant was a guest in the Victim's apartment such that he acquired standing to contest the warrantless entry into the Victim's apartment. We conclude that Defendant lacked standing to contest the search of the Victim's apartment. Having so concluded, we need not reach the district court's alternative ruling that the officers' entries into the Victim's apartment were permissible based on the emergency assistance exception to the warrant requirement. *Schlieter v. Carlos*, 1989-NMSC-037, ¶ 13, 108 N.M. 507, 775

P.2d 709 ("We have repeatedly declined to decide constitutional questions unless necessary to the disposition of the case.").

## B.      Defendant's Post-*Miranda* Statements Were Admissible

**{25}**    Defendant continues to assert that the *Miranda* warnings given to him at the police station were ineffective and that his post-*Miranda* statements should have been suppressed under *Seibert*. Specifically, Defendant contends he was questioned "multiple times" prior to receiving *Miranda* warnings, and that his post-*Miranda* interrogation was merely a continuation of his previous second curbside custodial interrogation. Focusing exclusively on Defendant's police station interview, the State responds that Defendant's post-*Miranda* questioning was not "a mere continuation of the earlier questions and responses" because Defendant did not make any admission prior to receiving *Miranda* warnings.

**{26}**    The Fifth Amendment to the United States Constitution, as applicable to the states through the Fourteenth Amendment, includes the privilege against self-incrimination. *State v. Filemon V.*, 2018-NMSC-011, ¶ 18, 412 P.3d 1089. "The Fifth Amendment mandates that, 'No person shall be . . . *compelled* in any criminal case to be a witness against himself[.]' " *State v. Javier M.*, 2001-NMSC-030, ¶ 12, 131 N.M. 1, 33 P.3d 1 (quoting U.S. Const. amend. V). In order to effectuate the constitutional privilege against self-incrimination, the United States Supreme Court announced in *Miranda v. Arizona* that prior to a custodial interrogation, "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. 436, 444 (1966). Failure to advise an individual of these rights prior to custodial interrogation raises a "presumption of coercion," *State v. Widmer*, 2020-NMSC-007, ¶ 12, 461 P.3d 881, and "statements that would otherwise be considered voluntary must be excluded." *Filemon V.*, 2018-NMSC-011, ¶ 19.

**{27}**    A suspect is in custody for the purpose of *Miranda* if a reasonable person in his position would believe he was not free to leave the scene of the interrogation. *State v. Munoz,* 1998-NMSC-048, ¶ 40, 126 N.M. 535, 972 P.2d 847. "The test is objective: the actual subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *Id.* (internal quotation marks and citation omitted). Whether an interrogation is custodial depends on all of the surrounding circumstances, but the "ultimate inquiry" is whether there was a "restraint on freedom of movement of the degree associated with a formal arrest." *State v. Hermosillo*, 2014-NMCA-102, ¶ 11, 336 P.3d 446 (internal quotation marks and citation omitted).

**{28}**    The district court ruled that Defendant's second curbside encounter transformed into a custodial interrogation when the officers began to question Defendant about the injuries to his hands. The State did not appeal this ruling. Pursuant to this unchallenged ruling, we analyze the facts beginning with Defendant's second curbside encounter from the point in which it transformed into a custodial interrogation in order to determine

whether Defendant's post-*Miranda* statements should have been suppressed under *Seibert*.

**{29}** In *Seibert*, the defendant was arrested as a suspect in a mobile home fire that killed a child. 542 U.S. at 604. A police officer questioned the defendant for up to forty minutes at the police station during which she confessed to knowing that the child was meant to die in the fire. *Id.* at 604-05. After a twenty-minute break, the same officer informed the defendant of her *Miranda* rights and obtained a signed waiver before asking her to repeat the earlier confession, which she did. *Id.* at 605-06.

**{30}** The United States Supreme Court described the police questioning in *Seibert* as "systematic, exhaustive, and managed with psychological skill." *Id.* at 616. The decision to not immediately inform the defendant of her *Miranda* rights was deliberate and part of a "technique of interrogating in successive, unwarned and warned phases." *Id.* at 609. The Court announced certain relevant factors in determining whether a so-called "midstream" *Miranda* warning was effective to advise a defendant of his or her rights including: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615.

**{31}** The questions posed to Defendant by Officer McDonnell during the second curbside encounter were limited to verifying the information provided by Cannon and to clarifying how Defendant had hurt his hands. The questions posed and answers received during this encounter are distinct from interactions wherein the police seek detailed statements from a suspect without first providing *Miranda* warnings in violation of *Seibert*. *Compare Filemon V.*, 2018-NMSC-011, ¶ 46 (finding the *Seibert* violation where police elicited a detailed statement from the suspect during the first round of interrogation before advising the suspect of his *Miranda* rights), *with State v. Bravo*, 2006-NMCA-019, ¶¶ 18-19, 139 N.M. 93, 128 P.3d 1070 (finding no *Seibert* violation where the record did not indicate the police employed the prohibited "question-first" technique before advising the suspect of her *Miranda* rights). Here, not once during the second curbside encounter was Defendant questioned about, nor did he discuss the details of his deadly encounter with the Victim.

**{32}** Aside from two questions concerning Cannon's statements and the injuries to Defendant's hands, there was no overlap between the questions posed to Defendant by Officer McDonnell and the detectives. The marked difference in the questions posed by Officer McDonnell and posed by the detectives was likely attributable to the difference in information available to each during their respective questioning. Officer McDonnell was not aware of the discovery of the Victim's body until after he had already begun to transport Defendant to the police station at the request of the detectives; however, Detectives Caplan and Juarez considered Defendant a suspect at the time they began to question him. Nor was there overlap in setting and police personnel: Officer McDonnell questioned Defendant in a public place, along a curbside whereas

Detectives Caplan and Juarez questioned Defendant at the police station later that day. Lastly, Detective Caplan did not treat his interview with Defendant at the police station as the continuation of questioning by Officer McDonnell. Rather, Detective Caplan began his interview with Defendant by setting out the reasons for the interview and obtaining identifying information before informing Defendant of his *Miranda* rights and then asking Defendant a series of in-depth questions over the course of more than an hour and a half.

**{33}**    We see little similarity between the facts in this case and those of *Seibert*. The record before us does not suggest that the police officers and the detectives investigating the Victim's homicide acted in concert to elicit incriminating statements from Defendant before warning him of his constitutional rights. We therefore affirm the district court's denial of Defendant's motion to suppress his post-*Miranda* statements.

## C.    Defendant's Post-Conviction Statements Were Not Subject to Suppression

**{34}**    Shortly after his conviction, Defendant underwent a sixty-day diagnostic evaluation in which he purportedly made incriminating statements regarding uncharged crimes and gang involvement. Defendant moved to suppress those statements. The district court denied the motion, explaining its ruling as follows: (1) the statements were not coerced in any way by law enforcement; (2) Defendant was warned as to how the statements would be used; (3) the evaluation order was not intended to elicit admissions of uncharged criminal conduct and gang affiliation; (4) the "mere admissions, without corroborating evidence, has minimal weight in the [c]ourt's eyes"; and (5) the district court was "capable of sorting out appropriate information for consideration" for purposes of sentencing. The district court imposed a sentence of fifteen years for Defendant's second-degree murder conviction and three years for each conviction for tampering with evidence. The district court enhanced each of those sentences by eight years under the habitual offender enhancement statute and ran each sentence consecutively for a total term of forty-five years imprisonment.

**{35}**    Defendant contends that the denial of his motion to suppress was error and that the sentence imposed violated his due process rights. Defendant points to his forty-five year sentence as evidence of prejudice stemming from his incriminating sentence. We disagree.

**{36}**    Defendant requested the sixty-day diagnostic evaluation, and it is undisputed that he was informed that statements made during the diagnostic evaluation would be used by the district court for sentencing purposes. No evidence has been presented that Defendant was either coerced or compelled into making the incriminating statements included in the evaluation report. *See State v. Costillo*, 2020-NMCA-051, ¶ 7, 475 P.3d 803 ("It is the extortion of the information from the accused, the attempt to force him to disclose the contents of his own mind, that implicates the Self-Incrimination Clause." (internal quotation marks and citation omitted)).

**{37}** Finally, there is no evidence that the district court considered the incriminating statements when arriving at Defendant's sentence. Rather, the district court took great care in making it clear that "mere admissions, without corroborating evidence, has minimal weight in the [c]ourt's eyes," and that "[t]he [c]ourt [was] capable of sorting out appropriate information for consideration of sentencing." Even if the district court *had* considered Defendant's statements, it would have been within its discretion to do so. *See State v. Gardner*, 2003-NMCA-107, ¶ 43, 134 N.M. 294, 76 P.3d 47 ("Our case law allows the court discretion to consider almost any relevant factor or evidence in determining the appropriate sentence." (alteration, internal quotation marks, and citation omitted)); *cf. State v. Montoya*, 1978-NMCA-009, ¶ 13, 91 N.M. 425, 575 P.2d 609 (explaining that "[t]he [defendant's] arrests, not leading to convictions, were properly considered by the sentencing judge because they are part of [the] defendant's pattern of conduct"). Based on the forgoing, we affirm the denial of Defendant's motion to suppress the incriminating statements he made during his sixty-day diagnostic evaluation.

**CONCLUSION**

**{38}** For the above-stated reasons, we affirm the district court's denial of each of Defendant's three motions to suppress.

**{39}** **IT IS SO ORDERED.**

**JACQUELINE R. MEDINA, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**KRISTINA BOGARDUS, Judge**