# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:** _____

**Filing Date: January 24, 2019**

**NO. S-1-SC-36508**

**STATE OF NEW MEXICO,**

     Plaintiff-Petitioner,

v.

**NATHANIEL YAZZIE,**

     Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Karen L. Townsend, District Judge**


Hector H. Balderas, Attorney General
Marko David Hananel, Assistant Attorney General
Santa Fe, NM

for Petitioner


Bennett J. Baur, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Respondent

**OPINION**

**VIGIL, Justice.**

**I.      INTRODUCTION**

{1}      With this opinion we revisit the circumstances under which an officer may make a warrantless entry into a home under the emergency assistance doctrine.[1] Relying on cases interpreting the Fourth Amendment to the United States Constitution, this Court held in *Ryon* that a warrantless entry is reasonable under the emergency assistance doctrine when (1) law enforcement officers "have reasonable grounds to believe that there is an emergency at hand and an immediate need for assistance for the protection of life or property;" (2) the officers' primary motivation for the search is a "strong sense of emergency" and not "to arrest a suspect or to seize evidence[;]" and (3) the officers have some reasonable basis, approximating probable cause, to connect the emergency to the area to be searched. *See* 2005-NMSC-005, ¶ 39.

{2}      Since *Ryon* was decided, the United States Supreme Court has clarified that the

---

[1]The United States Supreme Court has referred to this doctrine as the "emergency aid exception." *Michigan v. Fisher*, 558 U.S. 45, 47-48 (2009) (internal quotation marks and citation omitted). Historically, we have used the term "emergency assistance doctrine" to refer to the same constitutional principle. *See State v. Ryon*, 2005-NMSC-005, ¶ 1, 137 N.M. 174, 108 P.3d 1032. We continue use of our prior terminology in this opinion.

emergency assistance doctrine under the Fourth Amendment focuses on the objective reasonableness of the officer's actions and does not include a subjective component. *See Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) ("The officer's subjective motivation is irrelevant."). Applying the interstitial approach, we hold that an officer's subjective motivation remains relevant to the reasonableness of a warrantless entry under Article II, Section 10 of the New Mexico Constitution. We further hold that the officer's warrantless entry in this case was reasonable under the Fourth Amendment and Article II, Section 10. The Court of Appeals having concluded otherwise, we reverse. In doing so, we reiterate our recent holding in *State v. Martinez* that the presence of video evidence in an appellate record does not affect the deference due to a district court's factual findings at a suppression hearing if those findings are supported by substantial evidence. *See* 2018-NMSC-007, ¶¶ 18-19, 410 P.3d 186.

**II. BACKGROUND**

{3}     Defendant Nathaniel Yazzie entered a conditional plea of no contest to the offense of attempt to commit negligent child abuse following the district court's denial of his motion to suppress. Defendant had moved to suppress all of the evidence gathered after Officer William Temples of the Farmington Police Department entered

his unlocked apartment without a warrant in response to a welfare check. Defendant argued in his suppression motion that Officer Temples' entry violated his right to privacy in his home under the Fourth Amendment and Article II, Section 10. The State responded that Officer Temples' entry was reasonable to ensure the safety of those inside the apartment, thereby making his actions constitutionally permissible under the emergency assistance doctrine.

{4}     The district court held a hearing where it considered the officer's testimony as well as the lapel video from the night of the incident. The video was not played during the hearing, but the district court reviewed it prior to issuing its letter decision denying the motion to suppress. The letter decision did not include formal, enumerated findings of fact. On review, we will "draw from the record to derive findings based on reasonable facts and inferences." *State v. Attaway*, 1994-NMSC-011, ¶ 33, 117 N.M. 141, 870 P.2d 103. The record provides the following facts.

{5}     Officer Temples was dispatched to Defendant's residence to conduct a welfare check at 9:43 p.m. on December 5, 2013 after Defendant's downstairs neighbor had reported a loud "thumping" sound coming from the apartment above. Officer Temples testified that no one answered Defendant's door after he loudly knocked and announced himself as a police officer over the course of eight to ten minutes. He told

the district court that during that time, the only response to his knocking was an infant crying continuously and a young child "hollering, 'Mommy! Mommy, wake up!' " Officer Temples described the infant's cry as "a constant cry as if there was nobody caring for the child." He further testified that the doorknob rattled as though someone was trying, but unable, to open the door from the inside.

{6}     Officer Temples explained at the hearing that these observations led him to believe that someone in the apartment was hurt or otherwise incapacitated, leaving the children unattended. He said he thought the children's mother may have required aid because "usually when a child . . . asks their mommy to wake up several times, usually Mommy wakes up when she's sober or uninjured." Officer Temples testified that he opened the unlocked apartment door to peer inside once he concluded that his assistance was required within. When he did, he observed Defendant and an adult woman lying on the floor of the apartment with two children under six and an infant in the same room.

{7}     The lapel video shows Officer Temples knocking six times in the span of roughly six minutes before opening the unlocked apartment door. After his first knock, movement can be heard within, the doorknob rattles, and a child can be heard calling to his or her mother. Moments later, an infant begins to fuss. Officer Temples

4

knocks a second time and someone again rattles the doorknob but gives no additional response. After his fifth unanswered knock, Officer Temples announces that he is an officer of the Farmington Police Department and requests that someone come to the door. The fussing baby is heard again, but no one responds to his request. Officer Temples then says to himself, "Mom and Dad are obviously passed out." At this point in the video, the baby's crying increases in volume and tempo. A minute later Officer Temples knocks a sixth time and announces himself again. When he does not receive a response, Officer Temples opens the unlocked door of the apartment. He knocks a seventh time while standing in the doorway. About one minute later, Officer Temples calls for a backup officer and a portable breath test unit (PBT). He then fully enters the apartment, approximately eight minutes after his first knock.

{8} Officer Temples testified that once inside the apartment he performed a sweep of the adjoining rooms of the apartment to ensure officer safety, as well as to see if any other individuals in the apartment required assistance. During the sweep, Officer Temples observed empty alcohol bottles in the kitchen at the top of an open trash can.

{9} In the lapel video, Officer Temples performs a thirty-second sweep of the apartment, shining his flashlight into each of the rooms, including the kitchen. The lapel video shows that after the requested backup officer arrives, the pair of officers

5

physically rouse the adults, question them, and administer the breath tests. They do not call for a medical response unit. Based on the results of the breath tests, they arrest both adults. This sequence of events is reflected in Officer Temples' arrest report. Defendant was later charged with negligent child abuse contrary to NMSA 1978, Section 30-6-1(D) (2009).

{10}   In denying Defendant's motion to suppress, the district court concluded that the entry was justified under either the community caretaking or emergency assistance doctrines, citing *Ryon*. The district court explained that the entry was permissible because Officer Temples based his decision to enter on "what he was told and what he heard and observed at the apartment," which gave him "a reasonable concern that a medical emergency existed warranting immediate entry." The district court also concluded that the safety sweep was appropriate because "[i]t was a very brief inspection and was supported by what the officer observed upon entering the residence." Finally, the district court found that Officer Temples' "primary motivation was not criminal investigation but to render aid or protection from harm."

{11}   Following the denial of his motion to suppress, Defendant pleaded no contest to the lesser offense of attempt to commit negligent child abuse, a fourth-degree felony in violation of Section 30-6-1(D). He entered a conditional plea, reserving his

6

right to appeal the denial of the suppression motion.

**{12}** The Court of Appeals reversed the district court's denial of the motion to suppress. *State v. Yazzie*, No. 34,537, mem. op. ¶ 2 (N.M. Ct. App. May 11, 2017) (non-precedential). The State petitioned for certiorari to review the issue of whether Officer Temples' entry and subsequent inspection were lawful under the emergency assistance doctrine. *See* N.M. Const. art. VI, § 2; NMSA 1978, § 34-5-14(B) (1972); Rule 12-502 NMRA. We granted certiorari and reverse.

**III.   STANDARD OF REVIEW**

**{13}** "Appellate review of a motion to suppress presents a mixed question of law and fact. First, we look for substantial evidence to support the [district] court's factual finding, with deference to the district court's review of the testimony and other evidence presented." *Martinez*, 2018-NMSC-007, ¶ 8 (alteration in original) (internal quotation marks and citations omitted). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *In re Anhayla H.*, 2018-NMSC-033, ¶ 36, 421 P.3d 814 (quoting *State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 22, 132 N.M. 299, 47 P.3d 859). Contested facts are reviewed "in a manner most favorable to the prevailing party." *State v. Rowell*, 2008-NMSC-041, ¶ 8, 144 N.M. 371, 188 P.3d 95. "We then

review the application of the law to those facts, making a de novo determination of the constitutional reasonableness of the search or seizure." *Martinez*, 2018-NMSC-007, ¶ 8 (internal quotation marks and citation omitted). "Although our inquiry is necessarily fact-based it compels a careful balancing of constitutional values, which extends beyond fact-finding, to shape the parameters of police conduct by placing the constitutional requirement of reasonableness in factual context." *Ryon*, 2005-NMSC-005, ¶ 11 (omission omitted) (internal quotation marks and citation omitted).

{14}     After the Court of Appeals decided *Yazzie*, we reaffirmed in *Martinez* that appellate courts must afford a high degree of deference to the district court's factual findings if supported by substantial evidence. 2018-NMSC-007, ¶¶ 3, 15. In particular, an appellate court must presume that the district court credited an officer's testimony, even if that testimony is not perfectly aligned with video evidence. *See id.* When video evidence conflicts with other evidence, an appellate court must defer to the district court's factual findings if supported by evidence in the record. *See id.* ¶ 17. We accord such deference here.

**IV.     DISCUSSION**

{15}     This case centers on the reasonableness of Officer Temples' warrantless entry and search of Defendant's apartment under the emergency assistance doctrine. The

8

emergency assistance doctrine is an exception to the warrant requirement of the Fourth Amendment. *See Brigham City*, 547 U.S. at 403. It permits law enforcement officers to "enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* The emergency assistance doctrine arises from a police officer's duty as community caretaker to assist those "who are seriously injured or threatened with such injury." *Id.* This duty is "totally divorced" from law enforcement's separate goal of gathering evidence and investigating crime. *See Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).

{16} The "ultimate touchstone" of any Fourth Amendment search and seizure analysis is "reasonableness." *Brigham City*, 547 U.S. at 403 (internal quotation marks and citations omitted). In assessing reasonableness, courts must balance the public interest and an individual's right to be free from police interference upon personal liberty. *See State v. Williams*, 2011-NMSC-026, ¶ 10, 149 N.M. 729, 255 P.3d 307. Such balancing requires a close examination of the facts. Defendant challenges the constitutionality of Officer Temples' search under both the Fourth Amendment and Article II, Section 10. We first determine whether the entry and search were reasonable under the Fourth Amendment. If we conclude that Officer Temples' conduct was reasonable under the Fourth Amendment, we then apply our interstitial

approach to examine the reasonableness of his actions under Article II, Section 10. *See State v. Gomez*, 1997-NMSC-006, ¶¶ 19-21, 122 N.M. 777, 932 P.2d 1 (adopting the interstitial approach for determining whether a parallel provision of the New Mexico Constitution provides greater protection than its federal counterpart).

**A.      Reasonableness of the Entry and Search Under the Fourth Amendment**

{17}      The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. This protection is only conferred when individuals have a reasonable expectation of privacy in the place to be searched or the thing to be seized. *See Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). The parties do not dispute that Defendant had a reasonable expectation of privacy in his home. We agree. *See Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." (internal quotation marks and citation omitted)).

{18}      As an individual's privacy interests are strongest in the home, warrantless searches of a home are "presumptively unreasonable." *See Brigham City*, 547 U.S.

10

at 403 (internal quotation marks and citation omitted). That presumption can be overcome in certain exigent circumstances where an officer's warrantless entry is justified by a compelling need of law enforcement. *See id.* Acting to provide emergency assistance to "protect or preserve life or avoid serious injury" is such a justification which serves the public interest and tips the constitutional balance in favor of obviating the warrant requirement. *See id.* (internal quotation marks and citations omitted).

{19}    In *Ryon*, this Court adopted a widely-used analysis of the emergency assistance doctrine under the Fourth Amendment. *See* 2005-NMSC-005, ¶¶ 26, 29 ("The emergency assistance doctrine, which may justify more intrusive searches of the home or person, must be assessed separately by a distinct test."). At the time, the United States Supreme Court had acknowledged that a warrantless entry into a home may be justified by the need to render emergency aid, but the United States Supreme Court had not yet articulated the appropriate reasonableness analysis under the emergency assistance doctrine. In *Mincey v. Arizona*, the United States Supreme Court observed that "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. . . . But a warrantless search must be strictly circumscribed by the

11

exigencies which justify its initiation[.]" 437 U.S. 385, 392-93 (1978) (internal quotation marks and citation omitted).

{20}    The *Ryon* Court noted that, following *Mincey*, some courts had adopted a "purely objective test" to assess an entry under the emergency assistance doctrine, but the majority of courts had adopted the test first articulated in *People v. Mitchell*, 39 N.Y.2d 173, 347 N.E.2d 607 (1976) (abrogated by *Brigham City*, 547 U.S. 398). *Ryon*, 2005-NMSC-005, ¶ 29. In addition to assessing whether an officer reasonably believed that entry was necessary to respond to an imminent emergency and gauging whether the search was limited in scope to the emergency which justified the entry, the *Mitchell* test also inquired into an officer's *subjective* beliefs and motivations for the warrantless entry:

> First, "the police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property." Second, "*the search must not be primarily motivated by intent to arrest or seize evidence.*" Third, "there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched."

*Ryon*, 2005-NMSC-005, ¶ 29 (alterations and citations omitted) (emphasis added).

{21}    This Court recognized that a subjective inquiry is unusual in the Fourth Amendment context but nonetheless adopted the *Mitchell* test in full. *See Ryon*, 2005-NMSC-005, ¶ 33 ("The second part of the three-part *Mitchell* test is more

controversial. Federal and state courts, including New Mexico, usually do not consider the subjective intent of an officer in a search and seizure analysis."). In doing so, this Court reasoned that questioning the officer's subjective intent was critical to limiting the application of the emergency assistance doctrine, which could otherwise give law enforcement an easy way around the warrant requirement. *See id.* ¶ 34 ("A subjective test addresses the chief concern raised by a warrantless search purportedly justified by the community caretaker exception or emergency assistance doctrine: the possibility that the police will use the doctrine as a subterfuge or pretext when the real purpose of the search is to arrest a suspect or gather evidence without probable cause."). Mindful that the need to render emergency assistance may arise in the course of a criminal investigation, we clarified that "[a]lthough the police need not be totally unconcerned with the apprehension of suspects or the collection of evidence, the motivation for the intrusion must be a strong sense of emergency[.]" *Id.* ¶ 39.

{22}     The year after the *Ryon* decision, the United States Supreme Court ruled in *Brigham City* that an officer's subjective motivation was irrelevant in assessing the reasonableness of an entry under the emergency assistance doctrine. 547 U.S. at 404 ("An action is reasonable . . . , regardless of the individual officer's state of mind, as

13

long as the circumstances, viewed *objectively*, justify [the] action." (alteration in original) (internal quotation marks and citation omitted)). Despite that clear direction from the Supreme Court, New Mexico courts continued to use the *Ryon* test in Fourth Amendment cases. Notably, the decisions in cases decided on appeal rested solely on the first prong of the test. *See, e.g.*, *State v. Cordova*, 2016-NMCA-019, ¶¶ 8 n.1, 13, 366 P.3d 270 (concluding that the officers did not have "reasonable grounds to believe" that the defendant was injured, stating that the subjective prong of the *Ryon*/*Mitchell* test was "immaterial" to the analysis, and noting that the subjective prong was eliminated by the Supreme Court in *Brigham City*); *State v. Trudelle*, 2007-NMCA-066, ¶ 37, 142 N.M. 18, 162 P.3d 173 (stating that the officers could not "show reasonable grounds to believe there was an emergency requiring immediate assistance for the protection of life or property"); *State v. Baca*, 2007-NMCA-016, ¶ 27, 141 N.M. 65, 150 P.3d 1015 (concluding that the officer lacked "specific and articulable facts" to reasonably conclude there was an emergency at hand and a need for assistance).

{23} We are constrained by the Supreme Court's precedent in *Brigham City* and therefore eliminate the separate inquiry under *Ryon* into the officer's subjective intent for the entry and search under the Fourth Amendment. Accordingly, a warrantless

14

entry and search of a home is permitted under the emergency assistance doctrine if the state establishes just two elements. First, "[p]olice must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property[.]" *Ryon*, 2005-NMSC-005, ¶ 39. Second, "there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." *Id.* This two-part test controls whether Officer Temples' entry and subsequent search of Defendant's home was lawful under the emergency assistance doctrine of the Fourth Amendment.

**1.      Objective reasonableness of the entry**

{24}      In applying the first step of this analysis, we consider whether the district court's factual findings were supported by substantial evidence and whether those findings support a conclusion that Officer Temples' entry was objectively reasonable. An objective review requires us to assess the totality of the circumstances to determine whether a "prudent and reasonable official [would] see a need to act to protect life or property[.]" *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963); *see also Ryon*, 2005-NMSC-005, ¶¶ 30-31 (explaining that "reasonableness is tested objectively under the totality of the circumstances").

{25}      Law enforcement must have "credible and specific information" that a victim

is in need of emergency aid before a warrantless entry may be justified under the emergency assistance doctrine. *See Ryon*, 2005-NMSC-005, ¶¶ 42-43. In *Ryon*, officers responded to a " '911 call welfare check' " about a " 'possible stabbing victim.' " *Id.* ¶ 2. When they arrived at the scene, they learned from the bleeding victim that the perpetrator lived down the street. *Id.* A dispatch went out to locate the suspect who was thought to be on his way to his residence. *Id.* ¶ 4. As additional officers were en route to the suspect's home, the dispatcher told them that the suspect might be injured. *Id.* Upon their arrival at the house, the officers noticed that the lights were on and the front door was slightly ajar. *Id.* The officers did not receive a response when they knocked and announced their presence. *Id.* Relying on information that the suspect may be injured and finding it odd that the door would be open in the cold weather, the officers entered the home. *Id.* Inside they observed a bloodied knife in the kitchen sink, the knowledge of which they used to obtain a search warrant for the home. *Id.* ¶ 5.

{26} To aid in its determination of whether the officers' entry was objectively reasonable, this Court weighed "the purpose and nature of the dispatch, the exigency of the situation based on the known facts, and the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished." *Id.* ¶¶ 32,

16

43-44 (internal quotation marks and citation omitted). The Court concluded that the known facts—the knowledge that the suspect *may* be injured, the state of the house, and the lack of response at the door—did not point to an imminent emergency and that the officers did not do enough to corroborate the information they were given before entering without a warrant. *Id.* ¶¶ 43-45. The Court noted that the officers did not even know whether the suspect was home, let alone whether he was actually injured. *Id.* ¶ 43

{27}     The State argues that this case is distinguishable from *Ryon* and that Officer Temples' entry was objectively reasonable as the information available to him caused him to reasonably believe entry was necessary to protect Defendant's children and give aid to their mother. The State notes that Officer Temples' reasonable perception of the emergency came into focus with each new fact he learned while standing outside the apartment. At first, Officer Temples knew he was responding to a welfare check based on the neighbor's report of a loud thumping sound coming from Defendant's apartment. When Officer Temples arrived at the apartment, the thumping sound had been replaced with the sounds of a small child hollering in an attempt to rouse his or her mother and a baby fussing and then crying continuously. In addition, Officer Temples noticed the doorknob rattling several times as though someone were

attempting to open the door. Crucially, he did not hear the children's mother—or any adult—moving within the apartment, even though the child was yelling for his or her mother to wake up. The State asserts that each of these observations compounded upon the next to form a sufficient reasonable basis for Officer Temples to conclude that the nonresponsive mother required medical attention and that, due to her condition, the children were left alone in a dangerous situation.

{28}    Defendant argues that the facts available to Officer Temples were not enough to support a reasonable belief that a sufficiently compelling emergency existed within the apartment. Defendant focuses primarily on facts that were not present when Officer Temples knocked on the door—facts that would more clearly indicate an emergency. For example, there were no loud noises coming from the apartment when Officer Temples arrived and no sounds to indicate violent behavior inside. Additionally, there were no concerned neighbors gathered outside, no damage to the windows or building to indicate an altercation, and no signs of spilled blood. Furthermore, the children were not wandering alone outside to suggest that they were left unattended. *Contra United States v. Taylor*, 624 F.3d 626, 628 (4th Cir. 2010) (holding that an officer was justified in following a young girl into her home after finding her wandering alone on a busy street). Finally, Defendant argues that the

sounds of the children were unremarkable for the time of day when Officer Temples knocked. The small child's calls to the mother were not extraordinarily loud or severe, and the baby's crying was likely tied to Officer Temples' continued knocking. Defendant thus asserts that the known facts were insufficient to support an objectively reasonable belief that a serious emergency was underway. Instead, Defendant argues that Officer Temples was acting on mere conjecture that his assistance was required within the apartment.

{29}    We are not convinced by Defendant's argument that Officer Temples lacked key information to conclude that the children and their mother were in need of immediate aid. Viewing the facts in the light most favorable to the State and drawing all reasonable inferences in support of the district court's decision, there is substantial evidence to support the district court's factual findings in this case. In particular, Officer Temples' first-hand knowledge about the presence of small children—who apparently were unsupervised and unable to rouse their parents—supports the objective reasonableness of his conclusion that he needed to take action to "[protect] life or property." *See Ryon*, 2005-NMSC-005, ¶ 39.

{30}    In reaching this conclusion, we are persuaded by the reasoning in *Taylor*. 624 F.3d at 632, 635. The court in *Taylor* concluded that an officer's actions were

objectively reasonable when he accompanied a four-year-old girl into her house after she was found wandering alone on a busy street. *Id.* at 628. Before the officer entered the home, he asked the girl whether anyone was home to care for her. *Id.* at 629. She responded that no one was home and that she had been waiting for the bus to take her to day care. *Id.* The officer yelled "hello" into the home several times as he followed the young girl inside. *Id.* The girl's father responded that he was in a back room. *Id.* When the officer and the girl entered the room, the officer saw a bag of bullets next to the bed. *Id.* The officer proceeded to investigate the father and eventually charged him as a felon in possession of a firearm, a federal offense. *Id.* at 629-30.

{31}     The *Taylor* court held that the discovery of the young girl alone on a crowded street constituted an emergency which reasonably justified the officer's entry into the girl's home. *Id.* at 632. It noted that the exigency was not limited to the girl herself but also extended to her father. *Id.* ("[A] child of such tender age wandering alone outside the home raised the real possibility that her caretaker was unconscious or otherwise in need of assistance."). Because young children are "the most vulnerable members of our society[,]" to find the officer's actions unreasonable "would not be in the interests of small children, would not be in the interests of their parents, and would not be in the interests of the community." *Id.* at 635; *see also Hunsberger v.*

20

*Wood*, 570 F.3d 546, 549, 555 (4th Cir. 2009) (holding that a reasonable officer could conclude that entering an unoccupied house was necessary to locate a missing child who may have been inside).

{32}     In this case, the district court found that Officer Temples knew the children were left unattended because their mother was unresponsive for several minutes after a neighbor reported hearing a loud thumping coming from the apartment. Indeed, Officer Temples had several pieces of specific and credible information that, when coupled with reasonable inferences based on his observations, warranted his entry to provide emergency assistance.

{33}     Officer Temples' compounding observations formed a reasonable basis for him to conclude that his emergency assistance was required within the apartment. The purpose of the dispatch was to check on the welfare of those within Defendant's apartment. Based on the information from the dispatcher, Officer Temples knew that a neighbor had heard a loud thumping sound minutes before his arrival, but the apartment was silent when he got to the door. The only response he received to his repeated knocking was an infant's cries and a young child's plea to his or her mother to wake up. Unlike the officers in *Ryon*, Officer Temples knew the children were located inside the apartment. *Contra* 2005-NMSC-005, ¶ 43. Furthermore, Officer

21

Temples could reasonably infer that the mother was also in the apartment based on the child's call to her. He then made the rational inference that the mother may be injured or unconscious as he did not hear any adult movement within the apartment in the several minutes he stood outside.

{34} Knowing that the very young children were unattended, Officer Temples had few reasonable alternatives but to open the door and check on the occupants. Entering the apartment was the only feasible way for Officer Temples to corroborate his suspicion that the mother was unconscious. *Cf. id.* (reasoning that officers could have contacted their colleagues at the crime scene, walked around the home, looked in windows, or spoken with the occupants of the other house on the property before entering suspect's home). Officer Temples was the first officer to arrive at the scene. The apartment was not on the ground floor, and it does not appear from the lapel video that there were any windows accessible to Officer Temples. It would have been reasonable for Officer Temples to speak with Defendant's neighbors, but Officer Temples' failure to do so does not necessarily mean that his entry was unreasonable. *See id.* ¶ 32 ("The fact that a different course of action would have been reasonable does not necessarily mean the officer's actions are unreasonable."). Moreover, the downstairs neighbor had already reported to police the critical fact of the loud

thumping coming from the apartment.

{35} We are persuaded by the reasoning in *Taylor* that children deserve society's utmost protection. The very young children apparently left to care for themselves in this case also raised reasonable concerns about the welfare of their guardians. *See Taylor*, 624 F.3d at 632, 635. Our conclusion about the reasonableness of the entry in this case is based on the totality of the circumstances; no single fact in isolation is sufficient to justify Officer Temples' entry. For example, a baby crying for several minutes at night should not lead a reasonable officer to conclude that it is in emergency distress. Nor does the mere lack of response to an officer knocking at the door create a sufficient reasonable basis for an officer to enter a home out of concern that its occupants may be unable to come to the door. Based on the totality of the circumstances, Officer Temples reasonably perceived that the children were unattended and that their mother may be in need of emergency aid. We therefore conclude that Officer Temples' entry was objectively reasonable under the emergency assistance doctrine.

{36} Before we turn to the second prong of the modified *Ryon* test, we pause to correct the Court of Appeals about the standard of review that must be applied when assessing whether the district court's findings of fact are supported by sufficient

23

evidence. The Court of Appeals improperly rested its decision on an independent review of the lapel video and did not credit Officer Temples' testimony regarding the circumstances that led to his entry. *See Yazzie*, No. 34,537, mem. op. ¶¶ 11-12. For example, the Court of Appeals stated that the sounds of the baby and the child were "intermittent and briefly heard," *id.* ¶ 12, while Officer Temples testified that the child inside was "hollering" for the mother to wake up and that the baby was crying constantly as though left unattended. This discrepancy in the description of the volume and frequency of the children's noises demonstrates that the Court of Appeals substituted its own view of the evidence and failed to view these facts in the light most favorable to the State as the prevailing party. *Martinez*, 2018-NMSC-007, ¶ 12 ("On appeal, we must review the totality of the circumstances and must avoid reweighing individual factors in isolation. . . . In doing so, we . . . view the facts in the manner most favorable to the prevailing party." (internal quotation marks and citations omitted)).

{37} Additionally, the Court of Appeals did not appropriately defer to the district court's factual findings. The Court of Appeals' impressions regarding the sounds of the children on the video conflicted with Officer Temples' testimony at the hearing. When faced with conflicting evidence, the Court of Appeals should have deferred to

24

the district court's finding that Officer Temples' entry was justified based on "what he heard . . . at the apartment." *See Martinez*, 2018-NMSC-007, ¶ 17.

**2.      Reasonableness of the safety sweep**

{38}      The second step of the emergency assistance analysis under the Fourth Amendment requires inquiry into whether Officer Temples had "some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." *See Ryon*, 2005-NMSC-005, ¶ 39. When police officers enter a home under the emergency assistance doctrine, they are not permitted to do "more than is reasonably necessary to ascertain whether someone is in need of assistance . . . and to provide that assistance[.]" *Id.* ¶ 38 (omission in original) (internal quotation marks and citations omitted). This means that the officer must reasonably perceive "a direct relationship between the area to be searched and the emergency." *Id.* (internal quotation marks and citation omitted). A search upon entry must be limited to the "exigencies which justif[ied] its initiation." *Id.* (internal quotation marks and citation omitted). Essentially, this step asks whether the manner and scope of a search following an entry under the emergency assistance doctrine were reasonable. *See United States v. Najar*, 451 F.3d 710, 718 (2006) (explaining that this prong is primarily a question of scope).

{39}     In this case, the district court concluded that Officer Temples' safety sweep was appropriate as it was a "brief inspection" supported by Officer Temples' observations upon entering the apartment. There is substantial evidence to support these findings of the district court. First, the record shows that Officer Temples directly connected Defendant's apartment with the emergency at hand. He testified that he entered the apartment to which he was dispatched—the same apartment from which he heard a baby crying and a child attempting to awaken his or her mother.

{40}     Next, the evidence shows that the manner and scope of the search were reasonable. The lapel video shows that Officer Temples spent approximately thirty seconds peering into the rooms adjoining the main room. He shined his flashlight into each room, but he did not appear to fully enter the other rooms or disturb any objects within. According to Officer Temples' testimony, the empty alcohol bottles he observed were in plain view in the kitchen.

{41}     Finally, the record supports the conclusion that the sweep was limited to the exigencies that justified the initial entry. Officer Temples testified that he performed the brief safety sweep to ensure officer safety and to ascertain whether any other individuals required assistance. Finding no one in the apartment but the three children and their parents, the lapel video shows that Officer Temples returned to the main

room where he remained with the children as he attempted to rouse their parents.

{42} We defer to the district court's findings which we determine to be supported by substantial evidence. Based on those findings, we conclude that Officer Temples' safety sweep was reasonable and limited in scope to the emergency at hand. *Cf. Najar*, 451 F.3d at 720 (concluding that the officers' search was confined "to only those places inside the home where an emergency would reasonably be associated"). We hold that Officer Temples' entry and subsequent search were objectively reasonable and thus permissible under the emergency assistance doctrine of the Fourth Amendment.

**B.      Interstitial Analysis**

{43} Because we conclude in this case that Defendant's right to be free from warrantless police intrusion into his home is not protected by the Fourth Amendment, we proceed to examine his claim under Article II, Section 10. *See Gomez*, 1997-NMSC-006, ¶ 19 ("Under the interstitial approach, th[is C]ourt asks first whether the right being asserted is protected under the federal constitution. . . . If it is not, then the state constitution is examined.").

{44} Defendant asks this Court to depart from federal analysis of the emergency assistance doctrine to find a violation of his right to be free from unreasonable search

27

under Article II, Section 10. We have not adopted a test for the emergency assistance doctrine under our state constitution. *See Ryon*, 2005-NMSC-005, ¶ 6 n.3 (explaining that the discussion in that case was limited to a Fourth Amendment analysis). For this purpose, Defendant requests that we adopt the full, three-part *Ryon* test, including inquiry into the officer's primary, subjective motivations for the warrantless entry. To adopt this inquiry would conflict with federal guidance, however, we may diverge from federal precedent in interpreting our own constitution when we identify a flawed federal analysis, structural differences between the state and federal governments, or distinctive state characteristics which warrant such departure. *See Gomez*, 1997-NMSC-006, ¶ 19. We consider our distinct heightened preference for warrants and historical view that Article II, Section 10 offers greater protection for individual privacy rights than the Fourth Amendment to be "adequate grounds upon which to depart from federal jurisprudence." *State v. Crane*, 2014-NMSC-026, ¶¶ 15-16, 329 P.3d 689.

{45}     Article II, Section 10 of the New Mexico Constitution guarantees that "[t]he people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures[.]" In several instances, New Mexico courts have recognized that this provision provides broader protection of individual privacy rights than the

28

Fourth Amendment. *See State v. Leyva*, 2011-NMSC-009, ¶ 53, 149 N.M. 435, 250 P.3d 861; *State v. Garcia*, 2009-NMSC-046, ¶ 29, 147 N.M. 134, 217 P.3d 1032; *see also Crane*, 2014-NMSC-026, ¶ 16 (holding that Article II, Section 10 offers individuals greater protection than the Fourth Amendment of the right to privacy in their garbage left for collection); *State v. Ochoa*, 2009-NMCA-002, ¶¶ 8, 38, 146 N.M. 32, 206 P.3d 143, *cert. quashed*, 147 N.M. 463, 225 P.3d 793 (holding that pretextual traffic stops violate Article II, Section 10 though such stops are permitted under the Fourth Amendment). Article II, Section 10 confers this broader protection because it "is calibrated slightly differently than the Fourth Amendment." *Levya*, 2011-NMSC-009, ¶ 53 (internal quotation marks and citation omitted). It not only protects individual privacy rights and supports "the integrity of the criminal justice system," but it also serves as the "ultimate regulator of police conduct." *See id.* (internal quotation marks and citation omitted); *see also Attaway*, 1994-NMSC-011, ¶ 22 (requiring that police knock and announce their presence when executing a search warrant).

{46}     The regulatory role of Article II, Section 10 supports New Mexico's preference for warrants. *See Crane*, 2014-NMSC-026, ¶ 16 ("The underlying principle upon which the preference for warrants is predicated is that the judicial

29

warrant . . . provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime." (alteration, internal quotation marks, and citation omitted)); *see also Garcia*, 2009-NMSC-046, ¶ 30 (explaining that New Mexico favors warrants and a reasonableness analysis over blanket federal rules). Because the emergency assistance doctrine allows officers to enter a home without a warrant, our interpretation of Article II, Section 10 as the supreme regulator of police conduct requires us to assess an officer's warrantless entry and search under a more stringent standard.

{47}    Inquiry into an officer's primary motivation for entry affords individuals broader protection against baseless, warrantless intrusions into their homes. The subjective element of the *Ryon* test provides a judicial sieve through which courts may scrutinize warrantless police action and properly exclude evidence obtained under the guise of emergency response. *See Ryon*, 2005-NMSC-005, ¶ 37 ("[W]e permit the trial court to examine motivation because, in the absence of a warrant, a neutral magistrate has not provided a preliminary review."). As this analysis offers greater protection for individual privacy rights and serves to regulate warrantless police conduct, we consider the full *Ryon* test integral to the rights afforded under

Article II, Section 10.

{48} Accordingly, we adopt the complete *Ryon* test to determine under Article II, Section 10 when the emergency assistance doctrine may apply to a warrantless entry and search of a home. For the doctrine to apply: (1) "[p]olice must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property;" (2) "the search must not be primarily motivated by an intent to arrest a suspect or to seize evidence[, and] . . . the motivation for the intrusion must be a strong sense of an emergency;" and (3) "there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." *Ryon*, 2005-NMSC-005, ¶ 39.

{49} The first and third prongs of the *Ryon* test contemplate the same analysis conducted under the Fourth Amendment; we therefore come to the same conclusions reached above. Under Article II, Section 10, Officer Temples had objectively reasonable grounds to believe there was an emergency that required his immediate assistance to protect Defendant's children and their mother. Additionally, there was a reasonable basis for Officer Temples to associate the emergency with the apartment he ultimately entered and searched.

{50} Under the second prong, there is substantial evidence to support the district

31

court's conclusion that Officer Temples' primary motivation for entry was to render aid and protection from harm. Indeed, Officer Temples testified that he was worried about the mother's medical condition when she failed to respond to her child's plea to wake up. He further testified that her lack of response led him to believe that the children had been left unattended. The Court of Appeals did not analyze Officer Temples' primary motivation for entry, but it agreed with the district court that he appeared "genuinely concerned about the welfare of the children." *Yazzie*, No. 34,537, mem. op. ¶ 13.

{51} Defendant asks us to infer that Officer Temples' primary motive was not to render aid and protection but rather to investigate a suspected crime within the apartment. To support this inference, Defendant points to the facts that Officer Temples requested a unit with a PBT and did not call medical responders after entering the residence. The district court concluded that Officer Temples' "primary motivation was not criminal investigation." We will defer to the district court's decision as it is supported by substantial evidence. The facts relied upon by Defendant urging a contrary conclusion are not sufficient to overcome the standard of review in this case. *See Martinez*, 2018-NMSC-007, ¶ 15 ("An appellate court must indulge in all reasonable inferences in support of the district court's decision

32

and disregard all inferences or evidence to the contrary." (alteration, internal quotation marks and citation omitted)). In sum, Officer Temples' entry and search were reasonable under Article II, Section 10.

## V.　　CONCLUSION

{52}　For the foregoing reasons, we reverse the decision of the Court of Appeals. The district court properly denied Defendant's motion to suppress. Because it reversed the district court's denial of the motion to suppress, the Court of Appeals did not reach Defendant's remaining arguments. We remand this case for a determination of any issues remaining on appeal.

{53}　**IT IS SO ORDERED.**


_____

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**


_____

**JUDITH K. NAKAMURA, Chief Justice**

33

_____
**PETRA JIMENEZ MAES, Justice, Retired**
**Sitting by designation**


_____
**CHARLES W. DANIELS, Justice, Retired**
**Sitting by designation**


_____
**GARY L. CLINGMAN, Justice, Retired**
**Sitting by designation**

34