**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number:  2020-NMSC-015**

**Filing Date:  June 18, 2020**

**No. S-1-SC-36839**

**STATE OF NEW MEXICO,**

> Plaintiff-Appellee,

v.

**ISMAEL ADAME and ANGELA ADAME,**

> Defendants-Appellants.

**CERTIFICATION FROM THE NEW MEXICO COURT OF APPEALS**
**Jeff F. McElroy, District Judge**

Released for Publication December 15, 2020.

Coberly & Martinez, LLLP
Todd A. Coberly
Santa Fe, NM

for Appellants

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellees

Angelica Hall
Albuquerque, NM

for Amicus Curiae New Mexico Criminal Defense Lawyers Association

**OPINION**

**VIGIL, Justice.**

**{1}** In this opinion we address whether, pursuant to Article II, Section 10 of the New Mexico Constitution, defendants Ismael and Angela Adame (the Adames) had a reasonable expectation of privacy in personal financial records maintained by their banks. We hold that Article II, Section 10 does not recognize a reasonable expectation of privacy in the Adames' banking records, which consist of five years of financial information voluntarily shared with their banks. Accordingly, we affirm the district court, which declined to suppress the bank records of the Adames on the basis of the New Mexico Constitution.

## I.    BACKGROUND

**{2}** The Adames are a married couple and business owners in Taos, New Mexico. Federal and state law enforcement suspected that the Adames were involved in drug trafficking. As part of the investigation into the Adames, a federal grand jury issued subpoenas for, and obtained, the Adames' personal banking records. A state grand jury later issued two subpoenas duces tecum for the Adames' records at two banks. These state subpoenas required that the banks produce for a five-year period the Adames' checking account records, savings account records, loan records, safe deposit box records, certificates of deposit, money market certificates, United States treasury notes, United States treasury bills, credit card records, purchases of bank checks, certified check records, letters of credit, and wire transfer records, among other financial records.

**{3}** Using the Adames' financial records, multiple-count indictments were issued against the Adames, whose cases were joined. Of the 106 charges filed against them, all but two were financial in nature.

**{4}** The Adames filed a motion to suppress the financial records obtained from their banks by federal subpoena.[1] The Adames argued that, unlike the Fourth Amendment to the United States Constitution, Article II, Section 10 of the New Mexico Constitution provides for a reasonable expectation of privacy in a person's financial records possessed by the person's bank, and, further, a warrant supported by probable cause is required to obtain and then admit such records at trial.

**{5}** The district court declined to conclude that the New Mexico Constitution provides greater protection than the Fourth Amendment for financial records maintained by banks in the absence of "clear authority from a higher court[.]" Specifically, the district court concluded that "the financial records obtained under proper [f]ederal process can be used . . . to find probable cause for a search warrant," and, because they were obtained legally, the records can be used at trial. Similarly, it concluded that "the financial records obtained by a New Mexico grand jury subpoena . . . can be used . . . as evidence at a trial[.]"

---

1The federal grand jury subpoenas do not appear in the record. However, the Adames assert that the state subpoenaed the "same financial records" as were obtained pursuant to the federal subpoenas. The State does not assert otherwise. Accordingly, we assume for the purpose of our analysis that the records obtained through the federal subpoenas are the same as those demanded pursuant to the state subpoenas.

**{6}** The Adames moved the district court for an order allowing interlocutory appeal, which was granted. The Court of Appeals accepted the interlocutory appeal. The Court of Appeals then certified two questions to this Court, both of which we accepted: "(1) whether a person has a constitutional privacy interest in his or her financial records maintained by his or her financial institution under the New Mexico Constitution pursuant to Article II, Section 10; and (2) whether the State's use of federal and state grand jury subpoenas duces tecum in a state criminal proceeding is an unreasonable intrusion on that interest."[2]

## II. DISCUSSION

### A. Standard of Review

**{7}** This case presents a question of constitutional interpretation, which this Court reviews de novo. *State v. Ordunez*, 2012-NMSC-024, ¶ 6, 283 P.3d 282.

### B. Article II, Section 10 Does Not Provide Greater Protection of Privacy Than the Fourth Amendment for the Adames' Bank Records, Which Consist of Five Years of Financial Information That Was Voluntarily Shared With Their Banks

**{8}** The question before this Court is whether the protections of Article II, Section 10 of the New Mexico Constitution extend to the Adames' bank records, which consist of five years of financial information voluntarily shared with their banks, and include checking account records, savings account records, loan records, safe deposit box records, certificates of deposit, money market certificates, United States treasury notes, United States treasury bills, credit card records, purchases of bank checks, certified check records, letters of credit, and wire transfer records, among other financial records.

**{9}** Article II, Section 10 guarantees that "[t]he people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures." This protection from governmental intrusion is conferred only when a person has a reasonable expectation of privacy in that which is searched or seized. *Cf. State v. Yazzie*, 2019-NMSC-008, ¶ 17, 437 P.3d 182 ("[Fourth Amendment] protection is only conferred when individuals have a reasonable expectation of privacy in the place to be searched or the thing to be seized." (citing *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring))). A person has such an expectation of privacy when, by his or her conduct, a person has exhibited an actual (subjective) expectation of privacy that society is prepared to recognize as reasonable. *State v. Crane*, 2014-NMSC-026, ¶ 18, 329 P.3d 689 (citing *Katz*, 389 U.S. at 361 (Harlan, J., concurring)); *see also Smith v. Maryland*, 442 U.S. 735, 740 (1979).

---

[2]Because we conclude that there is no constitutionally protected privacy interest under the first question presented, we need not determine whether the governmental intrusion on the privacy interest of the Adames was reasonable. Accordingly, we consider the second question presented no further.

**{10}** The Adames contend that Article II, Section 10 provides greater privacy protection for their bank records than the Fourth Amendment. We analyze whether the New Mexico Constitution provides greater protection than an analogous provision of the federal constitution by applying the interstitial approach. *Morris v. Brandenburg*, 2016-NMSC-027, ¶ 19, 376 P.3d 836; *see also State v. Neal*, 2007-NMSC-043, ¶ 16, 142 N.M. 176, 164 P.3d 57 (stating that Article II, Section 10 and the Fourth Amendment are analogous constitutional provisions). Under the interstitial approach we address three questions: "(1) whether the right asserted by [the d]efendant is protected by the Fourth Amendment to the United States Constitution; (2) whether [the d]efendant preserved the state constitutional claim in the lower court; and (3) whether one of three established reasons exists to justify diverging from federal precedent." *Crane*, 2014-NMSC-026, ¶ 12.

**1.    The Fourth Amendment does not protect the Adames' personal bank records**

**{11}** The United States Supreme Court recognizes a distinction under the Fourth Amendment between information "a person keeps to himself and what he shares with others." *Carpenter v. United States*, 138 S. Ct. 2206, 2216 (2018). Under what has come to be known as the third-party doctrine, when a person voluntarily shares information with a third party, a person generally has no legitimate expectation of privacy in that information. *See id.* (describing the third-party doctrine). "As a result, the Government is typically free to obtain such information from the recipient without triggering Fourth Amendment protections." *Id.*

**{12}** The United States Supreme Court has held that a person has no legitimate expectation of privacy under the Fourth Amendment in bank records which consist of information voluntarily shared with third parties. *Id.* In *United States v. Miller*, the Government acquired several months of Miller's checks, deposit slips, and monthly statements from Miller's banks. 425 U.S. 435, 438 (1976). The United States Supreme Court held that Miller had no protected Fourth Amendment interest in those records. *Id.* at 444. First, the *Miller* Court reasoned that Miller could not assert "ownership" or "possession" of the documents, which were "business records of the banks." *Id.* at 440. Second, the "nature of those records confirmed Miller's limited expectation of privacy[.]" *Carpenter*, 138 S. Ct. at 2216. The checks were "not confidential communications but negotiable instruments to be used in commercial transactions," and the statements and deposit slips contained information "exposed to [bank] employees in the ordinary course of business." *Miller*, 425 U.S. at 442. The Supreme Court concluded that Miller had "take[n] the risk, in revealing his affairs to another, that the information [would] be conveyed by that person to the Government," *id.* at 443, and held that "there was no intrusion into any area in which [Miller] had a protected Fourth Amendment interest," *id.* at 440. After recent examination by the United States Supreme Court, the application of *Miller* remains undisturbed, *see Carpenter*, 138 S. Ct. at 2220, and the Adames do not contend that Fourth Amendment protections apply to their records.

**2.    The Adames' state constitution claim was adequately preserved**

**{13}** For a claim to be preserved, "it must appear that a ruling or decision by the trial court was fairly invoked." Rule 12-321(A) NMRA. This in turn requires "[a]ssertion of the legal principle and development of the facts." *State v. Gomez*, 1997-NMSC-006, ¶ 22, 122 N.M. 777, 932 P.2d 1. The Adames' motion to suppress the banking records in the district court was based solely on the argument that our state constitution protects an expectation of privacy in personal banking records. The district court based its denial of the claim on a considered determination that it could not find such protection in the New Mexico Constitution absent direction from New Mexico's appellate courts. No party contests the preservation of the state constitutional claim here, and we agree that the Adames' Article II, Section 10 claim was preserved.

**3.      The reasons to depart from federal precedent are inadequate**

**{14}** Pursuant to our interstitial approach, we recognize three reasons to depart from established federal precedent: "(1) the federal analysis is flawed or undeveloped; (2) structural differences exist between federal and state government; or (3) distinctive state characteristics exist that would support the departure." *Crane*, 2014-NMSC-026, ¶ 15. Defendants argue both that the federal analysis is flawed and also that there are distinctive state characteristics that justify a departure from federal precedent.

**a.      The federal analysis is not flawed**

**{15}** The Adames argue that the Fourth Amendment analysis of the United States Supreme Court in *Miller* is deeply flawed. The Adames state that the *Miller* Court should have "determined that an individual maintains a reasonable expectation of privacy in his or her financial records notwithstanding the fact [that such records are] held by a third party." To be sure, the Adames are not the first to criticize *Miller*.

**{16}** As the Adames point out, both the result in *Miller* and the third-party doctrine that animates it have been repeatedly questioned or criticized by scholars, some state courts, and by Justices on the United States Supreme Court. For example, Professor LaFave squarely criticizes *Miller* in his Fourth Amendment treatise, calling it "dead wrong," 1 Wayne R. LaFave, Search and Seizure § 2.7(c), at 970 (5th ed. 2012), and "lamentable," *id.* at 981, for its "substantial adverse impact upon values the Fourth Amendment seeks to preserve[,]" *id.* at 971 (internal quotation marks and citation omitted). Some scholars even comment on the sheer volume of criticism. *See* Orin S. Kerr, *The Case for the Third-Party Doctrine*, 107 Mich L. Rev. 561, 563 n.5 (2009) ("A list of every article or book that has criticized the [third-party] doctrine would make this the world's longest law review footnote."); Stephen E. Henderson, *Beyond the (Current) Fourth Amendment: Protecting Third-Party Information, Third Parties, and the Rest of Us Too*, 34 Pepp. L. Rev 975, 976 (2007) (noting that the third-party doctrine "has been the target of sustained criticism"). Our Court of Appeals has also recognized scholarly criticism of *Miller*. *State v. McCall*, 1983-NMCA-109, ¶ 22, 101 N.M. 616, 686 P.2d 958, *rev'd on other grounds*, 1984-NMSC-007, ¶ 1, 101 N.M. 32, 677 P.2d 1068.

**{17}** Several state courts have departed from *Miller*, sometimes reaching a different result and sometimes criticizing the third-party principle itself. Pennsylvania, for example, recognizes a reasonable expectation of privacy in bank records under its constitution. *Commonwealth v. DeJohn*, 403 A.2d 1283, 1291 (Pa. 1979) ("[U]nder . . . the Pennsylvania Constitution bank customers have a legitimate expectation of privacy in records pertaining to their affairs kept at the bank."); *see also, e.g.*, *State v. Thompson*, 810 P.2d 415, 418 (Utah 1991) (recognizing a right to privacy in bank records under the Utah Constitution); *but see, e.g.*, *State v. Schultz*, 850 P.2d 818, 834-35 (Kan. 1993) (declining to recognize a reasonable expectation of privacy in bank records under the Kansas Constitution). The Hawaii Supreme Court directly criticized the foundational reasoning of the third-party doctrine, in a case unrelated to banking records. *State v. Walton*, 324 P.3d 876, 906 (Haw. 2014) ("*Miller* . . . incorrectly rel[ies] on the principle that individuals who convey information to a third party have assumed the risk of that party disclosing the information to the government."); *see also Burrows v. Superior Court of San Bernadino Cty.*, 529 P.2d 590, 593 (Cal. 1974) (in bank) (stating, in a case decided prior to *Miller*, that "[i]t cannot be gainsaid that the customer of a bank expects that the documents, such as checks, which he transmits to the bank in the course of his business operations, will remain private, and that such an expectation is reasonable"). We acknowledge that not all states view favorably the United States Supreme Court's application of the third-party principle to bank records.

**{18}** Justice Sotomayor directly questioned the continued viability of the third-party doctrine as a categorical rule in a 2012 concurrence. She wrote that the approach of the third-party doctrine is "ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks." *United States v. Jones*, 565 U.S. 400, 417 (2012) (Sotomayor, J., concurring). Accordingly, she concluded that "it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties." *Id.* Justice Sotomayor's analysis built on previous disapproval of the third-party doctrine as a rule by Justice Thurgood Marshall. *Id.* at 418 (citing Justice Marshall's dissent in *Smith*, 442 U.S. at 749); *see also Smith*, 442 U.S. at 748-49 (Marshall, J., dissenting) ("I remain convinced that constitutional protections are not abrogated *whenever* a person apprises another of facts valuable in criminal investigations[.] . . . Privacy is not a discrete commodity, possessed absolutely or not at all. Those who disclose certain facts to a bank or phone company for a limited business purpose need not assume that this information will be released to other persons for other purposes." (emphasis added)). In fact, deep concerns about the third-party doctrine extend all the way back to one of the roots of the doctrine, *Miller*, which states:

> [T]he totality of bank records provides a virtual current biography. While we are concerned in the present case only with bank statements, the logical extension of the contention that the bank's ownership of records permits free access to them by any police officer extends far beyond such statements to checks, savings, bonds, loan applications, loan guarantees, and all papers which the customer has supplied to the bank[.] . . . Development of photocopying machines, electronic computers and other

sophisticated instruments have accelerated the ability of government to intrude into areas which a person normally chooses to exclude from prying eyes and inquisitive minds. Consequently judicial interpretations of the reach of the constitutional protection of individual privacy must keep pace with the perils created by these new devices.

425 U.S. at 451-53 (Brennan, J., dissenting) (internal quotation marks and citation omitted). As demonstrated, the criticisms of *Miller* and the third-party doctrine are enduring.

**{19}** Despite the enduring and sometimes prescient criticisms, the principles animating the third-party doctrine remain viable. Only recently, in 2018, the United States Supreme Court re-examined the third-party doctrine in a groundbreaking Fourth Amendment case. *Carpenter*, 138 S. Ct. 2206; *see also* Alan Z. Rozenshtein, *Fourth Amendment Reasonableness After Carpenter*, 128 Yale L.J. Forum 943, 943 (2019) ("*Carpenter . . .* is one of this generation's most important Fourth Amendment opinions." (footnote omitted)). In *Carpenter*, the United States Supreme Court narrowed the scope of the third-party doctrine. Susan Freiwald & Stephen Wm. Smith, *The Carpenter Chronicle: A Near-Perfect Surveillance*, 132 Harv. L. Rev. 205, 224 (2018). *Carpenter* held that there is a reasonable expectation of privacy in data from a cellphone-related technology where the data provided a detailed chronicle of the suspect's movements for seven days, even though the data was acquired from a third party that collected and kept the data for its own purposes. 138 S. Ct. at 2211-12, 2217 n.3, 2219-20. The *Carpenter* Court concluded that the third-party data was subject to Fourth Amendment protection and the government's acquisition of it was a search. 138 S. Ct. at 2223. *Carpenter* thus importantly established that the third-party doctrine is limited in scope: under certain circumstances Fourth Amendment protections apply to information voluntarily turned over to third parties. *See id.* at 2220*,* 2223; *id.* at 2247 (Alito, J., dissenting) (stating that it was "revolutionary" to allow a defendant to successfully raise a Fourth Amendment challenge to the search of a third party's property).

**{20}** But although the *Carpenter* Court narrowed the third-party doctrine in light of "new concerns wrought by digital technology," *id.* at 2222, it reiterated that the Fourth Amendment is inapplicable to "several months of canceled checks, deposit slips, and monthly statements," as held in *Miller*. *Carpenter*, 138 S. Ct. at 2216-17. The bank records in *Miller* were distinguishable from the "physical location information" revealed by the third-party data in *Carpenter*. *See id.* at 2223 (grounding Fourth Amendment protection for the third-party data obtained in *Carpenter* in the data's "deeply revealing nature[,] . . . its depth, breadth, and comprehensive reach, and the inescapable and automatic nature of its collection"). Not only did the *Carpenter* Court endorse the holding of *Miller*, it affirmed the principle that animates the third-party doctrine, stating that there is a "line between what a person keeps to himself and what he shares with others." *Carpenter*, at 138 S. Ct. at 2216.

**{21}** We agree with the United States Supreme Court that there is a constitutionally relevant difference between what is kept to oneself and what one chooses to share with

others. *Id.* at 2216. Conventional bank records consisting of information shared with, and obtained from, third parties do not raise any "new concerns wrought by digital technology." *Id.* at 2222. Such records are usually the business records of banks that are not owned or possessed by the suspect, are exposed in the ordinary course of business, and are not confidential communications but instead instruments or documents used in transactions. *See id.* at 2216. In sum, we conclude that the federal analysis articulated decades ago in *Miller* and recently narrowed in *Carpenter* is not flawed. Accordingly, we decline to depart from federal precedent on this basis. *See Gomez*, 1997-NMSC-006, ¶ 20 (stating that broader protection can be provided under the New Mexico Constitution where the federal analysis is unpersuasive because it is flawed).

### b.    Distinctive state characteristics do not support departure from federal jurisprudence

**{22}**    The Adames argue that we should depart from the result in *Miller* with regard to their records "because of New Mexico's established tradition of providing strong privacy protection to its citizens under Article II, Section 10." Indeed, "New Mexico courts have long held that Article II, Section 10 provides greater protection of individual privacy than the Fourth Amendment." *Crane*, 2014-NMSC-026, ¶ 16; *see also State v. Garcia*, 2009-NMSC-046, ¶ 31, 147 N.M. 134, 217 P.3d 1032 ("Article II, Section 10 is calibrated slightly differently than the Fourth Amendment."); *Developments in the Law—The Interpretation of State Constitutional Rights*, 95 Harv. L. Rev. 1324, 1359-60 (1982) (stating that federal constitutional rights provide the minimum level of constitutional protection, and a state is justified to develop independent doctrine in an area where the state considers the federal doctrine inadequate).

**{23}**    In addition to New Mexico's consistently strong preference for warrants, *Gomez*, 1997-NMSC-006, ¶ 36, our courts have recognized a number of specific circumstances that justify a departure from the Fourth Amendment. For example, New Mexico has provided greater protection to motorists detained at a border checkpoint. *See State v. Cardenas-Alvarez*, 2001-NMSC-017, ¶¶ 1, 9, 12, 20, 130 N.M. 386, 25 P.3d 225 (holding that Article II, Section 10, unlike the Fourth Amendment, requires reasonable suspicion of criminal activity to justify a detention at a border checkpoint that extends beyond an inquiry into a motorist's citizenship and immigration status, and review of the motorist's documents). And has provided greater protection from police entry by force to execute a warrant. *See State v. Attaway*, 1994-NMSC-011, ¶¶ 14, 25, 117 N.M. 141, 870 P.2d 103 (holding that Article II, Section 10 "requires law enforcement personnel to knock and announce their authority when executing a warrant," although "[the United States] Supreme Court has not determined whether officers executing a search warrant must knock and announce prior to entry"). Also, we have provided greater protection against seizure, among other circumstances in which New Mexico has departed from federal search and seizure doctrine. *See Garcia*, 2009-NMSC-046, ¶¶ 15, 26, 35 (holding under Article II, Section 10 that an individual is seized when a reasonable person would not feel free to leave, departing from the federal test that required a person to "submit to a show of authority by law enforcement" (emphasis omitted)); *see*

*also, e.g.*, *State v. Cordova*, 1989-NMSC-083, ¶¶ 1, 13, 17, 109 N.M. 211, 784 P.2d 30 (departing under Article II, Section 10 from the federal test for issuance of a warrant); *State v. Gutierrez*, 1993-NMSC-062, ¶¶ 1, 15 , 55, 55 n.10, 56, 116 N.M. 431, 863 P.2d 1052 (departing under Article II, Section 10 from the federal good faith exception for the exclusion of evidence obtained illegally).

**{24}** But none of those cases is much akin to this case—which involves the government's acquisition of a suspect's financial records from a third party—and accordingly do not control the result here. Perhaps in recognition of this, the Adames analogize most extensively to two New Mexico cases that recognized a reasonable right to privacy under Article II, Section 10 in one's trash. In *State v. Granville*, our Court of Appeals determined that Article II, Section 10 prohibits the warrantless search of an individual's sealed garbage bags placed in trash containers in an alley behind a residence. 2006-NMCA-098, ¶¶ 1, 3, 33, 140 N.M. 345, 142 P.3d 933. And in *Crane*, this Court extended the holding in *Granville* to garbage placed in opaque bags and left in a motel dumpster, "rather than being left in the motel room for disposal by the housekeeping staff." *Crane*, 2014-NMSC-026, ¶¶ 18, 20, 24.

**{25}** Both *Crane* and *Granville* emphasized that "when one seals garbage in an opaque container, one exhibits a reasonable expectation that the contents of the sealed, opaque container will remain private." *Crane*, 2014-NMSC-026, ¶ 22; *see also Granville*, 2006-NMCA-098, ¶ 27 ("There is a presumption that an expectation of privacy is reasonable when garbage is in a container that conceals the contents from plain view."). Among the fundamental reasons supporting the conclusion that an expectation of privacy in garbage is reasonable under Article II, Section 10 is that the information is concealed from view. *See Granville*, 2006-NMCA-098, ¶ 23 ("[T]he important issue [of the five] is whether the contents of one's garbage are concealed from plain view.").

**{26}** But unlike the trash in *Crane* and *Granville*, the information in bank records is visible to others, and known to be so; such information has been shared, not concealed. Checks, deposits, wire transfers, account statements, and the like are not "confidential communications" but, instead, "information exposed to bank employees in the ordinary course of business." *Carpenter*, 138 S. Ct. at 2216 (alteration, internal quotation marks, and citation omitted). In this important respect, bank records are different than trash placed out of view in opaque containers that are sealed or closed. In our view, individuals do not in general exhibit an actual (subjective) expectation of privacy in the financial information they expose to banking institutions and their employees. *See id.* at 2216, 2219 (stating that there is a reduced expectation of privacy in information voluntarily shared with third parties pursuant to the third-party doctrine). Accordingly, we do not find sufficient support from our trash cases to justify a reasonable expectation of privacy under Article II, Section 10 in conventional bank records containing information voluntarily shared with third parties. *See Crane*, 2014-NMSC-026, ¶ 18 (stating that an actual (subjective) expectation of privacy is requisite for a constitutionally cognizable reasonable expectation of privacy (citing *Katz,* 389 U.S. at 361 (Harlan, J., concurring))); *see also Morris*, 2016-NMSC-027, ¶ 19 ("Although we have the power to provide more liberty than is mandated by the United States Constitution when

interpreting analogous provisions in our own constitution, the burden is on the party seeking relief under the state constitution to provide reasons for interpreting the state provisions differently from the federal provisions when there is no established precedent." (alteration, emphasis, internal quotation marks, and citations omitted)).

**{27}** Even as we uphold the principle that there is a constitutional distinction "between what a person keeps to himself and what he shares with others," *Carpenter*, 138 S. Ct. at 2216, we recognize the limits of that principle. Shared information is not, of course, categorically unprotected under Article II, Section 10. *Cf. id.* at 2217 ("[T]he fact that . . . information is held by a third party does not by itself overcome the . . . claim to Fourth Amendment protection."). We emphasize that our decision is narrow. We express no view on more sophisticated bank records resulting from newer technologies that may reveal a person's "familial, political, professional, religious, and sexual associations" by, for example, creating a record of a person's whereabouts. *See id.* (internal quotation marks and citation omitted). Nor do we comment on an outsized collection of financial information from banks that might span decades or even a lifetime. Like the *Carpenter* Court, we do not profess to have all the answers today about, in our case, the application of Article II, Section 10 to information voluntarily shared with third parties. *See id.* at 2220, 2220 n.4 (noting that the Court "d[id] not begin to claim all the answers" at that time about the application of the Fourth Amendment to certain third-party information and collection techniques). We conclude only that distinctive state characteristics do not support a reasonable expectation of privacy under Article II, Section 10 in the Adames' bank records, which consist of five years of financial information voluntarily shared with their banks.

## III.    CONCLUSION

**{28}** For the reasons stated, we hold that the Adames did not have a constitutionally protected interest pursuant to Article II, Section 10 in their banking records, which consist of five years of financial information voluntarily shared with their banks. The district court properly denied the motion to suppress as to those records.

**{29}   IT IS SO ORDERED.**

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

**JUDITH K. NAKAMURA, Chief Justice**

**PETRA JIMENEZ MAES, Justice, Retired**
**Sitting by designation**

**GARY L. CLINGMAN, Justice, Retired**
**Sitting by designation**